**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard Cruz BREQUE, Defendant–
Appellant.**

**No. 91–5625.**

United States Court of Appeals,
Fifth Circuit.

June 15, 1992.

Rehearing and Rehearing En Banc
Denied July 28, 1992.

---

Nancy B. Barohn, Henry Ridgeway, San Antonio, Tex., for defendant-appellant.

Donald C. Lockhart, Atty., Dept. of Justice, Washington, D.C., Ronald F. Ederer, Richard L. Durbin, Jr., U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before HILL,* KING, and DAVIS, Circuit Judges.

KING, Circuit Judge:

Richard Cruz Breque appeals his conviction for conspiracy in violation of 18 U.S.C. § 371, 18 U.S.C. § 1956(a)(3), and 31 U.S.C. §§ 5313 and 5322(a). He also appeals his sentence. We affirm his conviction on all counts but vacate his sentence.

## I. STATEMENT OF THE CASE

We address the facts of this case in some detail. As a result of various investigations by the San Antonio branches of the Internal Revenue Service ("IRS") and the United States Customs Service, the authorities suspected that Breque and others were laundering unreported currency through El Centenario, a money exchange business in Laredo, Texas. Lucila Rangel, a special agent with the IRS, contacted Breque with money laundering proposals. Rangel called herself "Lucy Moreno," and told Breque that she was a representative of a Miami organization in need of money exchange services.

On June 6, 1989, Rangel telephoned Breque and asked if he would exchange $20,-000 for pesos. Breque agreed to do so for a 10% commission. Rangel remarked that the rate was very high, to which Breque responded that he charged that much "because of the way things are." Rangel finally assented to Breque's terms and the two agreed to meet on June 8 at a Denny's Restaurant in Laredo to finalize the deal.

On June 8, 1989, Rangel drove to the Denny's Restaurant and arrived at the

* Senior Circuit Judge of the Eleventh Circuit, sitting by designation.

scheduled time. Breque and an associate, Michael Zuniga, arrived half an hour later and informed Rangel that the three would drive together in Rangel's car to a nearby restaurant, called the Unicorn. When the group entered the Unicorn, Breque arranged for them to sit in a private section. Following lunch, Rangel informed Breque and Zuniga that she had only $15,000. The news upset Breque and he left the table to make a phone call. When he returned, he explained that the people he was dealing with had backed out of the transaction. He suggested, however, that the three should simply divide the $15,000 between them and exchange the portions individually. Rangel rejected this proposal, prompting Breque to assure her that a man named George Enriquez would join them shortly and would resolve the matter.

Enriquez arrived at the Unicorn a few minutes later and announced that the necessary pesos were being gathered. At that point, Breque remarked that if there were any papers to complete, he and Enriquez would do so later on. Enriquez grimaced in response and said "oh, no, no, no." Breque then said "okay" and Rangel said "okay." Rangel's interpretation of the discussion was that they had agreed not to file the required Currency Transaction Report ("CTR")[1] with respect to the $15,000 exchange.

The group then drove to the El Centenario money exchange. Breque directed them to a back room of the business and introduced them to Carlos Castiglioni. Rangel removed $15,000 in cash from a camera case and placed it on Castiglioni's desk. Castiglioni counted the money on a machine and handed Rangel a large sum of pesos. No one asked Rangel for any of the information necessary to complete a CTR, and no CTR was filed relating to that transaction. Following the deal at El Centenario, the group returned to the Denny's

Restaurant and Rangel paid Breque $1,500 for his services in arranging the exchange.

On June 15, 1989, Rangel telephoned Breque and they agreed to meet on June 20 in San Antonio to exchange $40,000 for pesos. Breque told Rangel that he would come to her hotel room, pick up her money, and then drive to a secret highway intersection, where an unnamed person would meet him to make the exchange. Afterwards, he would return to her hotel room with the pesos. During the same phone call, Rangel mentioned that a suspicious looking car had followed them on the day of the June 8 meeting, to which Breque replied:

> I don't think, I don't think it was uh, you know, I don't think it was anything federal or anything. I think it was just a bunch of guys that maybe thought we were, we had too much and maybe they wanted a little bit.

Rangel later interpreted those remarks for the jury as indicating that Breque "didn't think it was any federal agents or anything. He just thought it was maybe a rip off."

The meeting on June 20, 1990, took place at the Embassy Suites Hotel in San Antonio, and was recorded by a hidden video camera. Due to a misunderstanding between Breque and Rangel, and because Castiglioni could not supply the required pesos, no transaction occurred that day. During the meeting, Rangel made veiled references to drug dealing and the parties discussed illegal money laundering. Discussing various money laundering techniques, Rangel criticized the "old, worn out method" of taking money to a "friendly person." Breque agreed that the "friendly banker" method would no longer work because "[t]hey're all getting burned that way."[2] The discussion progressed as follows:

---

1. A Currency Transaction Report must be filed with the IRS when the amount of the exchange exceeds $10,000. *See* 31 C.F.R. § 103.22(a)(1) (1991).

2. At trial, Rangel explained that, in money laundering jargon, the "friendly banker ... is a banker who will sort of wink at the reporting

requirements and sort of let it slide and take the currency into the bank without filing the proper forms." Rangel further stated that Breque's comment "they're all getting burned that way," referred to the fact that "there has been a lot of enforcement activity involving banks and those CTR filing requirements."

[Breque:] [L]ike I was ... telling Mike, one of the things that's really gotten this thing very bad is all your TV movies, Miami Vice and everything that's making everybody kinda jittery, things the way are going ...

[Rangel:] yeah, and especially when, like I said, things get, things are getting warm

[Breque:] Uh huh

[Rangel:] in Florida right now. You know, and along the East ...

[Breque] Yeah, it's strange, all of a sudden, it just kinda started goin', I guess they didn't like selling the boats and cars and everything.[3] Now they want to get some more money out some place else and it's kinda dumb, it's stupid

[Rangel] well, they just, you know, they told me, you scout, go West (laughs) and find something. Find a way

[Breque] you know

[Rangel]: because our people are getting very nervous down there. The people that we normally do business with ...

[Breque:] Uh hum

[Rangel:] You know, are very nervous and, and

[Breque:] a lot, everybody's nervous.

In the course of the conversation, Breque claimed that he owned two offshore corporations and that he could easily handle $500,000 at a time. He also boasted that he had influence with the Prime Minister of Bermuda, and advised Rangel that she should consider opening a bank account there. Breque joked at one point about the possibility that Rangel was a law enforcement officer: "I mean, you're not going to put somebody in jail over there if you were who, who you might be, I hope not. I'm going to knock on wood on that one."[4]

Several times during the week after the June 20 meeting Breque telephoned Rangel with various proposals relating to money laundering. On June 27, 1989, Rangel returned one of Breque's calls and they arranged to meet on July 6 at La Posada hotel in Laredo to exchange $60,000 for pesos. Castiglioni testified at trial that he and Breque worked together on the details of the July 6 deal. Finding $60,000 in pesos was not easy, however. As of the morning of July 6, the pair had obtained only $30,000 worth of pesos and Castiglioni was therefore forced to drive to Mexico to pick up the remaining half.

That afternoon, Breque and Castiglioni met Rangel and another agent, Ruiz, at the hotel and exchanged the $60,000 for pesos. Following the exchange, Rangel paid Breque a 6½% commission. Again, no one asked Rangel for information necessary to complete a CTR, and no CTR was filed. Castiglioni admitted at trial that he made no effort to acquire this information and stated that he knew at the time that everyone concerned wished to avoid the CTR filing.

Following the July 6 transaction, Castiglioni met directly with Rangel and Ruiz on October 11, 1989, November 15, 1989, and January 24, 1990. On each occasion, they exchanged United States currency for pesos, and Castiglioni did not report the transactions. During the first meeting, Ruiz informed Castiglioni that their clients were "traffickers" who needed "money cleaned." During the second meeting, Castiglioni announced that he would charge an additional 2% fee for his services because of the dangers involved with laundering drug money. During the third meeting,

---

**3.** Rangel explained at trial that "Miami Vice was a television program about narcotics interdiction and about people getting arrested and for dealing drugs." She further explained that Breque's statement that "they didn't like selling the boats and cars" was a reference to the seizure of vehicles and vessels used in narcotics trafficking.

**4.** Breque defended his language at this meeting by explaining that he believed he had unwittingly stumbled into the company of "gangsters,"

and that to avoid being killed as a potential informant he pretended to be a gangster himself. Thus, Breque used expressions like "friendly banker" because they made his performance more realistic. In fact, he said, he had learned of that euphemism in a newspaper article, not through real life experience. Similarly, he testified that the line about offshore corporations had popped into his head because he had heard it in the movie "Lethal Weapon II."

the parties again discussed the illegal source of the funds.

On June 26, 1990, Rangel phoned Castiglioni and they agreed that Castiglioni would meet Ruiz and another undercover agent for a $100,000 "emergency" exchange of pesos. This time, Castiglioni insisted on a 5% fee. Castiglioni also informed Rangel that he was working with Breque again, and that Breque would assist him with the planned transaction. At trial, Castiglioni testified that Breque advised him to increase his fee to 5% because the "service that we were providing was worth a lot more for these people." The Government cross-examined Castiglioni on the subject of the services rendered as follows:

> [Government:] The service you were providing was worth a lot more than the two percent that you were charging?
>
> [Castiglioni:] Correct.
>
> [Government:] But you were providing the service that you provide to anybody who walked into El Centenario. Right?
>
> [Castiglioni:] Yes.
>
> [Government:] I mean if I came in with a hundred—you might have trouble getting it together on the spot, but if I came in with a hundred thousand dollars and wanted to exchange it, you'd do it with me, wouldn't you, at that time, if you could put it together?
>
> [Castiglioni:] Yes, but I have to file a form.
>
> [Government:] But you have to file a form. That's the service you're providing is not filing a form, and also—but you had been dealing with these people and not filing a form and not charging them five percent for quite some time. Right?
>
> [Castiglioni:] Correct.
>
> [Government:] But just like you said to Agent Ruiz, it's got to be more. It's got to be at least two percent because you people are saying that you're drug dealers. You got to expect that, so Mr. Breque is advising that because of the service you're providing, not just the ex-

change and not just failing to file a form, because of who you're dealing with

> [Castiglioni:] Correct
>
> [Government:] —you're going to charge more. Right? Right?
>
> [Castiglioni:] Correct.

When Breque and Castiglioni arrived at La Posada hotel on the afternoon of June 28, federal officers placed them under arrest.

Following a jury trial in the United States District Court for the Western District of Texas, Breque was convicted of conspiring with Castiglioni and Enriquez to fail to file CTRs in violation of 18 U.S.C. § 371 and 31 U.S.C. §§ 5313 and 5322(a).[5] In addition, Breque was convicted of conspiring with Castiglioni to launder money represented by a law enforcement officer to be the proceeds of specified unlawful activity (narcotics sales), in violation of 18 U.S.C. § 1956(a)(3)(C).

Pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2S1.1, the district court sentenced Breque to a term of imprisonment of fifty-five months, to be followed by a three-year term of supervised release. He was also charged $10,000 in fines and a $100 special assessment. This appeal followed.

## II. DISCUSSION

### A.

■ Pursuant to 31 U.S.C. § 5313(a) and 31 C.F.R. § 103.22(a)(1), financial institutions must file CTRs with the IRS when they engage in individual currency transactions exceeding $10,000. A person who "willfully" violates the above provisions commits an offense under 31 U.S.C. § 5322(a). *See, e.g., United States v. Gollott,* 939 F.2d 255, 257 (5th Cir.1991). Though the primary responsibility for filing CTRs rests with the agents of the financial institution, "a customer's collusion with a financial institution to avoid filing CTRs ... constitutes an unlawful conspiracy in violation of 18 U.S.C. § 371." *United States v. Cure,* 804 F.2d 625, 628 (11th Cir.1986) (citations omitted).

---

5. Castiglioni pleaded guilty to this crime prior to Breque's trial.

Breque contends that the evidence is insufficient to convict him of conspiracy to fail to file CTRs in violation of 18 U.S.C. § 371 and 31 U.S.C. §§ 5313 and 5322(a). We note that the evidence against Breque was sufficient to convict him if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Contreras*, 950 F.2d 232, 236 (5th Cir.1991) (citing *United States v. Lemons*, 941 F.2d 309, 314 (5th Cir.1991)), *cert. denied*, —— U.S. ——, 112 S.Ct. 2276, 119 L.Ed.2d 202 (1992). We review the evidence "in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict." *Id.*

We find that there is evidence showing that Breque willfully conspired with Castiglioni and Enriquez to fail to file the CTRs, because he knew of the reporting requirements and decided not to comply with them. *See United States v. O'Banion*, 943 F.2d 1422, 1429 (5th Cir.1991). On June 8, 1989, Breque met with Rangel and discussed exchanging her $15,000 for pesos. Breque apparently understood the $10,000 filing requirement because he recommended that he, Rangel, and Zuniga divide her $15,000 and exchange the portions individually. Breque subsequently introduced Rangel to Castiglioni who effected the exchange. Castiglioni did not file a CTR, and made no inquiries of Rangel so that he could have done so. While Breque contends that he merely stood idly by and watched Castiglioni make the exchange, it is undisputed that he introduced Rangel and Castiglioni for the purpose of exchanging currency.

The conversation at the Unicorn, during which Breque inquired as to whether he should file forms (and subsequently assented to Enriquez' refusal to do so) demonstrates that Breque knew of the reporting requirements, yet nevertheless agreed not to file a CTR. Furthermore, as the Government points out, the manner in which the exchange was arranged—backroom meetings, mysterious cars, a 10% commission for Breque's services—suggests that the participants were aware that their activities were illegal. At one point,

Breque assured Rangel that the car following them was "not federal or anything." At the June 20 meeting, Breque lectured Rangel as to money laundering techniques, and joked about the possibility that she was a law enforcement officer. Breque arranged for the second unreported currency exchange with Castiglioni and received 6½% commission. Finally, Breque helped Castiglioni plan the $100,000 unreported transaction that led to their arrest.

A rational jury could have found that the evidence proved all elements of the crime. Sufficient evidence therefore supported Breque's conviction for conspiracy to fail to file CTRs.

### B.

■ Breque also contends that the evidence was insufficient to convict him of conspiring with Castiglioni to violate § 1956(a)(3)(C). 18 U.S.C. § 1956(a)(3) provides, in relevant part, as follows:

(3) Whoever, with the intent—

. . . .

(C) to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph ... the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

18 U.S.C. § 1956(a)(3)(C). Subsection (c)(7) defines "specified unlawful activity" to include a wide range of crimes, including violations of the narcotics laws. 18 U.S.C. § 1956(c)(7). To prove a violation of this section, the Government must prove (1) that the defendant conducted or attempted to conduct a financial transaction, (2) with the intent to avoid a transaction reporting

requirement, and (3) that the property involved in the transaction was represented by a law enforcement officer to be the proceeds of specified unlawful activity. 18 U.S.C. § 1956(a)(3)(C).

Prong one of the test is uncontested, and our analysis above satisfies prong two. Only prong three, whether a law enforcement officer represented that the currency presented for exchange was the proceeds of unlawful activity, is at issue.

Breque argues that the Government is trying to hold him responsible for revelations made by Rangel to Castiglioni after Breque left the alleged conspiracy. On October 11, 1989, Rangel explicitly told Castiglioni that her Miami clients were "traffickers" who needed "money cleaned." Later, Castiglioni stated that he would increase his fee because of the dangers involved in exchanging drug money.

We recognize that Rangel never explicitly informed Breque that the dollars were the proceeds of drug activity. She did, however, allude to it strongly. During their June 20 discussion, Rangel told Breque that "my people down in ... Florida wanted me to ask you some things, uh, we've got kind of a problem ... we've got a lot of money coming in," which they needed to put "into a useable form." Rangel also stated that "things are getting pretty warm in Florida right now," to which Breque responded that the television show "Miami Vice," a show about narcotics dealing, "made everybody kinda jittery." Breque also opined that law enforcement agents were no longer satisfied "selling the boats and cars and everything," referring to the seizure of items used in drug trafficking. While Rangel's language with Breque may have been ambiguous (unlike

her express representations to Castiglioni) to a layman, Breque's responses reveal that Breque understood her comments to mean that the currency came from drug trafficking activity. Furthermore, on June 28, 1990, Breque joined Castiglioni to plan the $100,000 transaction which led to their arrest. Just prior to the scheduled transaction, Breque advised Castiglioni to charge a 5% commission because of the dangers of dealing with drug dealers. This, too, indicates that Breque understood Rangel to mean that her funds derived from drug-related activities.

We find that there is sufficient evidence from which a jury might conclude that Rangel represented to Breque that the funds were the proceeds of drug activities. A rational jury could have found Breque guilty of conspiracy to violate 18 U.S.C. § 1956(a)(3)(C).

### C.

■ Breque next contends that the district court erred when it instructed the jury as to "deliberate ignorance."[6] The term "deliberate ignorance" "denotes a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged, the defendant choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be caught." *See United States v. Chen*, 913 F.2d 183, 191–92 (5th Cir.1990) (quoting *United States v. Restrepo–Granda*, 575 F.2d 524, 528 (5th Cir.), *cert. denied*, 439 U.S. 935, 99 S.Ct. 331, 58 L.Ed.2d 332 (1978)); *see also United States v. Lara–Velasquez*, 919 F.2d 946, 951 (1976).

Because Breque did not object to this instruction at trial, we review it for plain error.[7] *See* Fed.R.Crim.P. 52(b). Accord-

---

6. The instruction reads as follows:

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating

that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

7. Breque notes that he objected to the "deliberate ignorance" instruction in his motion for a new trial. That objection was not contemporaneous, however, and therefore the plain error standard still applies. *See United States v. Winn*, 948 F.2d 145, 159 (5th Cir.1991) (objection to jury instruction after jury deliberates is

ing to Rule 52(b), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." This court has defined "plain error" as "error which, when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Lopez,* 923 F.2d 47, 50 (5th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2032, 114 L.Ed.2d 117 (1991).

■ This circuit applies a two-part test in deciding whether the district court erred in giving a "deliberate ignorance" instruction. *Lara–Velasquez,* 919 F.2d at 952. First, evidence at trial, viewed in the light most favorable to the Government, must show that the defendant was *subjectively* aware of a high probability of the existence of the illegal conduct. Second, the evidence must show that the defendant purposely contrived to avoid learning of the illegal conduct. *Id.* The purpose of this test is clear: if there is no evidence indicating the defendant subjectively knew his act to be illegal, a deliberate ignorance instruction "poses the risk that a jury might convict the defendant on a lesser negligence standard—the defendant *should* have been aware of the illegal conduct." *Id.* at 951 (emphasis in original).

As to the CTR offense, Breque contends that the instruction was wrongly given because the "jury may well have concluded that the Government was only obligated to prove that Breque *should have known* of the reporting requirements." We disagree. As we discussed earlier, the jury was presented with considerable evidence that Breque, in fact, *knew* of the reporting requirements. Indeed, in the conversation at the Unicorn, Breque specifically raised the issue. The instruction could not have misled the jury as to the proper standard to apply.

Breque also contends, in somewhat oblique fashion, that the instruction may have

not contemporaneous and is reviewed for plain error), *cert. denied,* —— U.S. ——, 112 S.Ct. 1599,

confused the jury into concluding that it could convict Breque of violating 18 U.S.C. § 1956(a)(3) if it found that he *should have known* the money to have been from specified unlawful activity, even absent proof by the Government that a representation was made by Rangel as to the source of her funds. This contention, too, has no merit. As we have noted above, for purposes of § 1956(a)(3), the Government put forth sufficient evidence that Rangel made representations to Breque that the money was proceeds of specified unlawful activity. The instruction in no way suggested that the Government need not have proven that Rangel made a representation. Indeed, the jury instruction which dealt specifically with 18 U.S.C. § 1956(a)(3) made clear to the jury that the Government had to prove that Rangel made a representation. Accordingly, there was no error in giving the deliberate ignorance instruction.

### D.

■ Over Breque's objections at sentencing, the district court raised Breque's base offense level by three levels pursuant to U.S.S.G. § 2S1.1(b)(1). At the time Breque was sentenced, that section provided as follows:

If the defendant *knew* that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increase by 3 levels.

U.S.S.G. § 2S1.1(b)(1) (Nov.1990) (emphasis added). We review the district court's application of the Sentencing Guidelines *de novo, see United States v. White,* 945 F.2d 100, 101 (5th Cir.1991), but review the district court's factual findings only for clear error. *United States v. Bachynsky,* 949 F.2d 722, 734 (5th Cir.1991).

Breque argues that the money was not the proceeds of an unlawful activity because it was Government "sting" money. As such, he reasons, he could not "know" the funds to be the proceeds of unlawful activity. To "know" a fact, he suggests, implies the existence or truth of that fact.

118 L.Ed.2d 313 (1992).

The plain language of the section, he concludes, precludes its application to his case.[8]

According to the Government, however, for a defendant to "know" that funds are the proceeds of unlawful activity requires only that the defendant be subjectively certain that such is the case. "Know" suggests a high degree of subjective confidence as to a fact, according to the Government, but does not require that the fact be objectively true.

This is an issue of first impression in any circuit, inasmuch as the only decisions to have examined the 1990 version of § 2S1.1(b)(1) involved the laundering of actual proceeds of narcotics dealing. *See United States v. Restrepo,* 936 F.2d 661, 665 (2d Cir.1991); *United States v. Atterson,* 926 F.2d 649 (7th Cir.), *cert. denied sub nom. Laurelez v. United States,* —— U.S. ——, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991). Fortunately, we need not now opine as to the meaning of "knowledge," because we have adequate guidance for our consideration of § 2S1.1(b)(1) from the amended section, effective November 1, 1991, which was not applicable to Breque. The new guideline reads:

> If the defendant *knew or believed* that the funds were proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increase by 3 levels.

U.S.S.G. § 2S1.1(b)(1) (Nov.1991) (emphasis added). Appendix C of the 1991 Amendments describes the purpose of the amendment to § 2S1.1(b)(1):

> Section 2S1.1(b)(1) is amended by inserting "or believed" immediately following "knew"....
>
> This amendment revises this guideline to reflect the enactment of subsection (a)(3) of 18 U.S.C. § 1956 that authorizes undercover "sting" operations in money laundering cases. Such cases differ from those prosecuted under subsection (a)(1) in that the money being laundered

is not actually criminal proceeds, but is government "sting" money that an undercover officer represents to be criminal proceeds. In all other respects, subsections (a)(1) and (a)(3) are the same. The effective date of this amendment is November 1, 1991.

U.S.S.G. App. C, Amendment 378 (1991) (bold omitted).

While recognizing that the "believed" standard does not apply here because it works a substantive change of the guideline, *see United States v. Miller,* 903 F.2d 341, 347–49 (5th Cir.1990), the Government argues that the amended section suggests the intention behind the earlier draft of § 2S1.1(b)(1). We disagree. Section 2S1.1(b)(1) was amended expressly to include defendants caught in Government sting operations. The addition of the term "believe" to effect this purpose suggests quite strongly that the word "know" in the version of § 2S1.1(b)(1) relevant here is insufficient, by itself, to encompass the state of mind of defendants caught laundering money that is not, in fact, the proceeds of drug activity. *See United States v. Payne,* 962 F.2d 1228 (6th Cir.1992) (finding that amendment of § 2S1.1(b)(1) encompasses individuals who "believe" that sting funds are proceeds of unlawful narcotics activity). As the amendment to the guidelines shows, for the specific purposes of § 2S1.1(b)(1), Breque only "believed" the money to be proceeds of narcotics activity, but could not "know" it to be so. Accordingly, the application of U.S.S.G. § 2S1.1(b)(1) to raise Breque's base offense level three levels was error.

### III. CONCLUSION

We AFFIRM Breque's conviction on all counts. As to his sentence, we VACATE and REMAND to the district court for re-sentencing consistent with this opinion.

---

**8.** Breque also argues that § 2S1.3(b)(1) should apply rather than § 2S1.1(b)(1). This argument ignores the fact that the element distinguishing these two sections is that the funds laundered come from narcotics activity. Section 2S1.1(b)(1) speaks directly to the laundering of narcotics proceeds.