UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

Wisting R. FIERRO, Olga L. Martinez, Jaime Ibanez a/k/a Ibania, Jesus A. Serna, Defendants–Appellants,

Jose J. Grajales, Defendant–Appellant, Cross–Appellee.

No. 92–2370.

United States Court of Appeals, Fifth Circuit.

Nov. 11, 1994.

---

Wisting Fierro, pro se.

Olga Martinez, pro se.

Thomas J. Bevans, Houston, TX, for Ibanez.

Jesus A. Serna, pro se.

Evelyn Graham Rodriquez, Houston, TX (Court-appointed), for Serna.

Richard B. Kuniansky, Houston, TX (Court-appointed), for Grajales.

Paula Offenhauser, Asst. U.S. Atty., Houston, TX, Ronald G. Woods, U.S. Atty., Houston, TX, for U.S.

Before REAVLEY, DeMOSS and STEWART, Circuit Judges.

DeMOSS, Circuit Judge:

This case began in November 1991 with an investigation by Houston police and IRS agents into a narcotics conspiracy involving approximately 178 kilograms of cocaine. The five defendant-appellants, Wisting Fierro, Olga Martinez, Jesus Serna, Jaime Ibanez and Jose Grajales, were charged in a January 8, 1992 superseding indictment with:

Count 1: conspiracy to possess cocaine with the intent to distribute, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846;

Count 2: aiding/abetting possession of cocaine, 18 U.S.C. § 2; and

Count 3: conspiracy to commit money laundering, 18 U.S.C. §§ 371, 1956(a)(1)(A)(i).

In addition, Grajales and Serna were each indicted on a substantive count of cocaine possession with the intent to distribute. On April 24, 1992, after a 11–day trial, the jury convicted all five defendants on all counts. The district court sentenced the defendants as follows: Grajales received 240 months each on Counts 1 and 2, and 60 months on Count 3. Serna received 188 months each on Counts 1 and 2, and 60 months on Count 3. Fierro received 293 months each on Counts 1 and 2, and 60 months on Count 3. Ibanez received 151 months each on Counts 1 and 2, and 120 months on Count 3. Martinez received 121 months each on Counts 1 and 2, and 60 months on Count 3. The judge ordered all terms of imprisonment to be served concurrently. Each defendant also received: (1) a $150 assessment of mandatory costs, and (2) two five-year terms of supervised release on Counts 1 and 2, and three years of supervised release on Count 3 (also to be served concurrently).

All five defendants have appealed their convictions and sentences, raising various grounds for reversal. The government has brought a cross-appeal to challenge Grajales' sentence.

We affirm the convictions of all defendants on all counts, and we affirm the sentences imposed on defendants Fierro, Martinez, Serna and Ibanez. We hold that the government's cross-appeal has merit, and we therefore vacate Grajales' sentence and remand his case for re-sentencing.

## FACTUAL BACKGROUND

The facts and evidence relating particularly to each defendant are discussed at length later in this opinion, so our initial factual summary will be brief. On November 12,

1991, Houston police and IRS officers began surveillance of a house at 17026 French Road ("the French Road house") after they received information from a confidential informant. During a four-day period of surveillance ending November 16, 1991, Fierro, Martinez, Serna and Ibanez were observed (1) coming and going, sometimes carrying packages, bundles or bags, to and from the French Road house and an apartment at 8791 Hammerly ("the Hammerly apartment"); (2) driving to other locations in their vehicles; (3) making numerous phone calls on pay phones and mobile phones as well as answering pager calls; (4) meeting briefly with other unknown people in parking lots or at business establishments; and (5) engaging in "counter-surveillance"-type conduct that showed their suspicion that they were being watched. In addition, before and after meetings with the other defendants, Serna was seen going in and out of a third residence at 7831 Prestwood ("the Prestwood house" or "the stash house"). At about 3 p.m. on November 16, 1991, Serna arrived at the Prestwood house, stayed about 20 minutes and emerged with a weighted blue denim bag, which had been seen previously in Martinez' possession. After driving to a gas station to make a phone call, Serna drove to the rear of a warehouse on Harwin Street, took the blue denim bag into the brush and returned to his car without the bag. Officers immediately recovered the bag, which contained four kilograms of cocaine wrapped with tape and Spanish-language newspaper. After leaving the warehouse area, Serna made and received a telephone call from a pay phone and then was apprehended. Fearing that Serna had alerted the others, officers began procedures to secure search warrants for the three residences. Just minutes after Serna had made his last phone call and was arrested, Grajales was seen arriving at the Prestwood house and attempting to leave three minutes later. Grajales was carrying a key to the Prestwood house, and Grajales' personal documents and photographs were found inside the house. A neighbor testified that Grajales had lived in the Prestwood house for nine months to a year. A subsequent search pursuant to warrant at the Prestwood house uncovered, among other items, 84 kilograms of cocaine (of similar purity to the 4 kilograms in the denim bag) found in the kitchen cabinets and garage; a 9mm semi-automatic pistol and two boxes of ammunition; a suitcase, bag and box stuffed with cash totaling $1,132,146; a digital scale; a pager; rolls of duct tape; a police radio scanner and an adding machine. Also found were several tally documents and adding machine tapes, indicating that the money had been counted and bundled by denomination with rubber bands.

Later in the evening of November 16, 1991, the French Road house was also searched pursuant to warrant. No drugs or large amounts of money were found there, but several "kilogram wrappings" made of tape and Spanish-language newspapers were found in the kitchen. The wrappings were similar to those around the kilograms found at the Prestwood house and in the bag abandoned by Serna. The search of the French Road house also uncovered several notebooks and documents identified as drug ledgers. The Hammerly apartment and Ibanez' car were searched after Ibanez signed a consent form. A wallet and a small address book containing drug ledger information were seized from Ibanez's car. Fierro, Martinez and Ibanez were arrested at the apartment. Various items of evidence found at the three residences connected the defendants with each other and with the drug operation. Documents found in the French Road house revealed that thousands of dollars had been sent by wire transfer to Columbia, by or on behalf of the defendants. The money was sent in amounts of less than $10,000 at a time to avoid triggering a currency report to the Internal Revenue Service.

## ISSUES

The five defendants raise various issues to challenge their convictions and sentences:

(1) Was the evidence sufficient to convict each defendant for (a) conspiracy to possess cocaine, (b) aiding and abetting cocaine possession, and (c) conspiracy to commit money laundering?

(2) Did Ibanez voluntarily consent to a search of his apartment and vehicle?

**768**

(3) Was the prosecutor's closing argument so improper that it raised doubt as to the correctness of the jury's verdict?

(4) Did the trial court err in instructing the jury on "deliberate ignorance?"

(5) Did the district court abuse its discretion in admitting certain "drug ledger" documents into evidence?

(6) Did the trial court clearly err in sentencing?

## DISCUSSION

### Sufficiency of the Evidence to Support Convictions

The elements of a drug conspiracy are: (1) the existence of an agreement to possess narcotics with the intent to distribute, (2) knowledge of the agreement, and (3) voluntary participation in the agreement. *United States v. Mergerson*, 4 F.3d 337, 341 (5th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1310, 127 L.Ed.2d 660 (1994). The jury may infer a conspiracy from circumstantial evidence and may rely upon presence and association, along with other evidence. Proof of an overt act in furtherance of the conspiracy is not required; a common purpose and plan may be inferred from a development and collection of circumstances. *United States v. Robles–Pantoja*, 887 F.2d 1250, 1254 (5th Cir.1989). Aiding and abetting has three elements: The defendant must have (1) associated with a criminal venture, (2) participated in the venture, and (3) sought by action to make the venture successful. *Mergerson*, 4 F.3d at 342. Five elements must be proven for a conviction for conspiracy to launder money: (1) there is a conspiratorial agreement, (2) one conspirator knowingly commits an overt act by participating in a financial transaction, (3) the financial transaction involves the proceeds of an unlawful activity, (4) the conspirator participating in the transaction had the intent to promote or further that unlawful activity, and (5) the transaction affected interstate or foreign commerce. *United States v. Thomas*, 12 F.3d 1350, 1360 (5th Cir.), *cert. denied sub. nom. Sanchez v. United States*, — U.S. —, 114 S.Ct. 1861, 128 L.Ed.2d 483 (1994); *see also* 18 U.S.C. § 1956(c).

When reviewing a challenge to the sufficiency of the evidence to support a conviction, the appellate court must consider all evidence in the light most favorable to the guilty verdict and accept all reasonable inferences tending to support the verdict. The ultimate inquiry is whether a rational trier of fact could have found guilt on each count beyond a reasonable doubt. *United States v. Huntress*, 956 F.2d 1309, 1318 (5th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 2330, 124 L.Ed.2d 243 (1993) (noting that juries "may use their common sense and evaluate the facts in light of their knowledge of the natural tendencies and inclinations of human beings.").

The following evidence, summarized here in the light most favorable to the guilty verdict, supports the convictions of all defendants on all counts:

*Grajales:* He possessed a key to the Prestwood stash house and lived there for at least nine months. He concealed his connection to the stash house by using a different address on his driver's license (the same address as Serna's driver's license). He was present at the stash house during surveillance on the same day the 80–plus kilograms of cocaine were seized from the stash house. His personal items were found inside the stash house. Grajales' fingerprints were on one of the money count documents found inside the stash house, and the government argued that the scribbled initials on the money count documents resembled Grajales' driver's license signature. He hurriedly arrived and departed from the stash house just minutes after Serna threw away the 4 kilograms and made a phone call prior to his arrest. The timing of Serna's phone call and Grajales' arrival at the stash house raises the inference that when Serna knew he had been caught, he called the "big boss" to warn him. The government argued that Grajales was the overall leader of the drug operation, who maintained control over the cocaine and money by living at the stash house and keeping records of the operation.

*Serna:* He testified that he met Grajales only once or twice, but his driver's license

bears the same address as Grajales' driver's license. Surveillance officers testified that Serna entered the stash house once on Nov. 14, three times on Nov. 15 (when he stayed inside the house for a whole afternoon) and twice on Nov. 16 (therefore was in the house when the cocaine and money were there and must have known of the drug operation). He admitted to (and was observed) carrying packages to and from the Prestwood, Hammerly and French Road residences. He was also seen meeting with people in business establishments and parking lots before and after trips to the Prestwood house. He showed guilty knowledge by engaging in counter-surveillance activity. He was observed carrying a weighted denim bag out of the stash house and abandoning it behind a warehouse after he realized that he was being followed. (The bag, which had been seen previously in Martinez's possession, contained four kilograms of cocaine that was of similar purity to the cocaine seized from the stash house). Serna testified that he did not know Ibanez and met him on the day they both were arrested, but surveillance officers had observed that Serna knew and used the security access code to enter the Hammerly apartment where Ibanez lived. Although Serna claimed that he didn't know Fierro before mid-November 1991, telephone records showed that Serna was paged 56 times from Fierro's mobile phone during October 1991. An address book found at the French Road house, where Fierro lived, has Serna's pager number listed next to the name "Gordo." Serna admitted that his nickname is Gordo, and the name Gordo appears on several drug ledger documents found in the French Road house and in Ibanez's car. The government argued that Serna was the courier who reported directly to Grajales and had access to the large amounts of cocaine in the stash house.

*Fierro:* In the month prior to his arrest, he called Serna's pager 56 times on his mobile phone and made 843 other mobile phone calls that month. He lived at the French Road house with Martinez and Ibanez. His fingerprints were found on "kilogram wrappings" made of newspaper and

tape seized from the French Road house. (The wrappings matched those around the cocaine found in the stash house and in the bag abandoned by Serna.) The utilities at the French Road house were in Fierro's name. He knew the access code to the Hammerly apartment and was seen driving to and from the French Road house and the apartment with Martinez, making phone calls, and meeting with other people. His fingerprints were found on documents identified as drug ledgers that were seized from the French Road house. He was born in the Columbian city to which wire transfers of money were made. His fingerprints were found on documents associated with money laundering transactions and on an address book/drug ledger found in Ibanez's car. The government argued that Fierro was the organizer/leader of a cocaine distribution operation at the French Road house; he purchased cocaine from Grajales through Serna, and he used Ibanez and Martinez as couriers to distance himself from the movement of the cocaine.

*Ibanez:* He is Fierro's nephew. He initially participated in leasing the French Road house, kept personal documents there and was often there with Fierro and Martinez. He generally lived in the Hammerly apartment that he had leased along with Fierro, although he used at least two other addresses to receive bills and mail. The address on his driver's license was the same as the address on Martinez's Texas ID card. The leasing documents signed by Ibanez for the French Road house and Hammerly apartment contained false information about his work history and the length of time he had been in the United States. The government alleged that Fierro wanted the leases in Ibanez's name because Ibanez had a student visa, was residing lawfully in the United States and had references that could be verified. An address book/drug ledger apparently owned by Martinez was found in the glove compartment of Ibanez's car. Martinez's wallet, containing a receipt for the purchase of a .38–caliber revolver by Martinez, was also found in his car. Ibanez's fingerprints were found on a wire transfer

document seized from the French Road house trash. He wire transferred more than $9,000 to a woman in Columbia who he claimed was his mother. He was seen carrying an object or objects cradled in a leather jacket into and out of the French Road house and Hammerly apartment, making phone calls and meeting briefly with various people in parking lots and apartments. The government argues that Ibanez was a courier for his uncle, Fierro, and that he was aware of the full scope of Fierro's operation.

*Martinez:* She was Fierro's girlfriend. She lived in the French Road house with Fierro and Ibanez. Her fingerprints were found in numerous places on the drug ledger documents seized from the French Road house. She participated in leasing the French Road house under a false name. Her address book (with her fingerprints on it) containing drug ledger information was found in Ibanez' car. She was seen in possession of the denim bag that Serna later used to carry the four kilograms of cocaine. She was seen accompanying Fierro and Ibanez driving to pay phones and making trips to and from the French Road house and the Hammerly apartment, and meeting with other unknown people in parking lots. She had access to the Hammerly apartment along with Fierro. She was present in the car with Fierro when Fierro made numerous phone calls to Serna's pager. Her Columbian passport was found in the French Road house. Her Texas identification card bore the same address as Ibanez's driver's license. Her fingerprints—and on at least one occasion, her name—were found on wire transfer documents found in the French Road house trash. She admitted to transferring $5,000 to a man in Columbia as a "favor" to another man she had known less than a month. She purchased a .38–caliber revolver and the receipt was found in Ibanez' car. She claimed she later lost the gun. The government argued that Martinez was a subordinate to her boyfriend, Fierro, and was aware of his drug distribution operation and participated in keeping records of it.

Based on the evidence as stated, and keeping in mind the standard of review for sufficiency, we hold that the evidence was sufficient to support the jury's convictions of all five defendants on all counts.[1]

### Whether Ibanez's Consent to Search was Voluntary

■ Before trial, Ibanez moved to suppress all evidence seized during the November 16, 1991 search of the Hammerly apartment and Ibanez's Ford Escort, claiming that the consent he gave was not voluntary. No drugs were seized from the car or apartment, but two items found in the car were introduced at trial—a wallet and an address book with drug ledger information in it, both apparently belonging to Martinez. After holding a evidentiary hearing on the motion to suppress, the trial court denied the motion, finding that Ibanez's consent to the search was voluntary.

■ On the day in question, several police officers knocked on the door of Ibanez's apartment and requested consent to search, stating that some kilograms of cocaine had been seized from a person who had been seen earlier at Ibanez's apartment. Ibanez signed a Spanish-language consent-to-search form. At the suppression hearing, Ibanez testified that he gave consent "first because I have nothing to hide," and secondly because he was afraid of the officers. The officers did not explain to him that he had a right to refuse them entry. The court, in denying the motion, pointed to Ibanez's testimony:

"I think his consent was voluntarily given. He said it. Whether or not he had some apprehension or whether he was under some constraint ... I think anyone, any individual would be under some apprehension or stress in that regard.... I don't see any overbearing conduct or anything of that sort by the officer, so I'm going to deny the motion."

---

1. Serna does not attack the sufficiency of the evidence to support his substantive drug conviction.

Consent is a fact issue, so the trial court's determination that consent was voluntary will not be reversed absent clear error. The government has the burden to prove consent by a preponderance of the evidence, *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir. 1990) (en banc), and the reviewing court must take into account the totality of the circumstances surrounding the consent. *United States v. Gonzalez–Basulto*, 898 F.2d 1011, 1012–13 (5th Cir.1990); *See also United States v. Olivier–Becerril*, 861 F.2d 424, 426 (5th Cir.1988) (noting six factors relevant to voluntariness); *United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir.1988) (noting that voluntariness does not require giving of *Miranda* warnings or informing subject of right to refuse). We have reviewed the suppression hearing record, and we do not find clear error in the trial court's finding that Ibanez voluntarily consented to the search.

### Whether Prosecutor's Arguments Require Reversal

■■■■■ Grajales complains that the prosecutor's closing arguments were so improper that they denied Grajales a fair trial. He contends that the prosecutor (1) improperly commented on Grajales' failure to testify by stating that "defendants present no credible evidence that any of them ever did any work," and (2) intentionally misstated the law of conspiracy by stating that a defendant is guilty of conspiracy if he knows of others' criminal activity and does not take affirmative steps to disassociate himself from that activity. Grajales' counsel objected to both arguments, but on each occasion the objection was overruled.

■■■■■ The prosecution may not comment directly or indirectly on a defendant's failure to testify. *United States v. Bright*, 630 F.2d 804, 825 (5th Cir.1980). A misstate-

ment of the law by the prosecutor during closing arguments can also invalidate a conviction. *United States v. Mackey*, 571 F.2d 376, 384 (7th Cir.1978). When a contemporaneous objection is made to such a comment, the standard of review is whether the defendant's substantial rights have been prejudiced. *United States v. Granville*, 716 F.2d 819, 821 (11th Cir.1983). Grajales argues that the "failure-to-testify" comment requires that he receive a new trial, and that the misstatement of conspiracy law requires reversal of his conviction, because it unconstitutionally shifted the burden of proof by telling the jury that the defendant had to come forward with evidence that he took affirmative steps to "get off the bus." Grajales contends that both improper arguments were aggravated by the trial court's overruling of objections, because this implied that the court approved of the argument.

■■■■ We do not view the prosecutor's comments in isolation, but rather in the context of the entire trial. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). The dispositive question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict. *United States v. Kelley*, 981 F.2d 1464, 1473 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2427, 124 L.Ed.2d 647 (1993). We give deference to a district court's determination of whether closing arguments are prejudicial or inflammatory. *United States v. Willis*, 6 F.3d 257, 263 (5th Cir.1993). We had reviewed the entire trial transcript, including the closing arguments, and we hold that the prosecutor's "conspiracy bus" simile, taken in context, did not cast serious doubt upon the correctness of the verdict because (1) the court gave an accurate explanation of conspiracy law; (2) the court instructed that the arguments of counsel are not evidence;[2]

---

2. The context of this instruction makes it clear that the jurors understood that the court's version of the law is the version they must follow. After the prosecutor completed his main closing argument and Grajales' counsel began his closing argument, the government objected to Grajales' counsel's description of conspiracy law. The following exchange took place:
*Prosecutor:* "Judge, I'm going to object. That's an inaccurate statement of the law."

*The Court:* "Overruled. Ladies and gentlemen of the jury, I will instruct you on what the law is. The lawyers will tell you what their interpretation is, and they may even argue what they think the facts are. But you are the fact finders, and I will give you the law at the end of the case." *Counsel for Grajales:* "It's obvious there is a disagreement on what the law is. But you will be instructed, as the judge told you.... And we

(3) the evidence of Grajales' guilt was sufficient to support his conviction. Regarding the alleged comment on Grajales' failure to testify, we disagree that a reasonable jury would interpret the argument as such. In addition, although the government may not comment directly or indirectly on the defendant's failure to testify, the government may comment on the failure of the defense, as opposed to the defendant, to counter or explain the evidence. *United States v. Soudan,* 812 F.2d 920 (5th Cir.1986), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). We hold that the prosecutor's comments did not prejudice Grajales' substantial rights or cast serious doubt upon the correctness of the verdict.

*"Deliberate Ignorance" Instruction*

 The court instructed the jury that:

"The elements of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to you. A finding beyond reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may inferred from willful blindness to the existence of that fact."

Grajales points out that such an instruction is dangerous because it might allow the jury to convict a defendant who "should have known" of illegal conduct. A "deliberate ignorance" instruction is properly given only when "the facts support an inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct, and ... he purposely contrived to avoid learning of the illegal conduct." *United States v. Breque,* 964 F.2d 381, 388 (5th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993); *see also United States v. Ojebode,* 957 F.2d 1218, 1229 (5th Cir.1992) (stating that such an instruction "should rarely be given"), *cert. denied,* — U.S. —, 113 S.Ct. 1291, 122 L.Ed.2d 683 (1993). Grajales claims that the instruction was improper on the facts of his

case because "there was no question presented on whether [Grajales] closed his eyes to the obvious." The government argues that Grajales did not properly object at trial and that thus a plain error analysis is appropriate. In any case, we hold that the instruction was proper. The evidence shows that Grajales lived in the Prestwood house for at least nine months. On November 16, 1991— the same day that more than $1 million in cash was seized from a bedroom of the Prestwood house, and 84 kilograms of cocaine were seized from the kitchen cabinets and garage of the Prestwood house—Grajales was seen entering and leaving the house and was carrying a key to the house. At trial, Grajales' counsel made the following argument:

"Now, so what if this man had the keys to that house? Did that mean that's the only keys to this house? Did that mean he is the only person that has access to that house? Did that mean he knew what was in the kitchen? Does that mean that he knew there was money in that suitcase locked up in another bedroom?"

We hold that such an argument claims a lack of guilty knowledge, and it clearly supports the deliberate ignorance instruction.

*Admission of Drug Ledgers*

 Fierro and Martinez challenge the trial court's admission into evidence of drug ledgers seized from the French Road house and the address book/drug ledger found in Ibanez's car. The drug ledger documents were found under sofa cushions, on the coffee table and in the master bedroom closet at the French Road house where Fierro and Martinez lived. A government expert testified that the calculations in the various ledgers were related to kilograms and prices per kilogram. The government did not introduce any testimony from a handwriting expert to determine the author of any of the drug ledgers, even though an IRS expert had examined the calculations in the ledgers along with court-ordered handwriting samples from all five defendants.

will wait and see who is right when the instruc- tions are read to you tomorrow."

■ Martinez did not object to the admission of any of the ledgers, and Fierro objected only to the admission of the three ledgers found in the French Road house. Therefore, Martinez's challenge on appeal to the admission of all four ledgers—and Fierro's challenge to the admission of the ledger found in Ibanez's car—are reviewed today only for plain error. *See* FED.R.CRIM.P. 52(b); *United States v. Olano*, — U.S. —, —— —, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993).

■ Fierro and Martinez claim that the ledgers are hearsay and cannot be admitted as admissions or co-conspirator statements under Federal Rules of Evidence 801(d)(2) because the government did not prove who authored them. They also contend that the evidence does not support the admission of the drug ledgers as business records under Federal Rules of Evidence 803(6). However, identification of the declarant—such as the author of a drug ledger—is not always necessary for the admission of a co-conspirator statement. *United States v. Breitkreutz*, 977 F.2d 214, 218–20 (6th Cir.1992). In addition, there is other evidence connecting Martinez and Fierro with the ledgers, which also supports their admissibility. *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir.1993). An FBI expert identified Martinez's fingerprints on 95 separate places on the ledger found on the coffee table, and Fierro's prints were identified on 23 separate places on the coffee table ledger. On the address book/drug ledger found in Ibanez's car, the expert found Martinez's prints in five places and Fierro's prints in two places. Both Martinez and Fierro lived in the house where the ledgers were found, and there was other evidence of their involvement in the cocaine conspiracy, including Fierro's and Martinez's connections and activities with the other defendants. We hold that the trial court's admission of the ledgers was not error.

*Sentencing*

### A: Amount of Cocaine Involved in Conspiracy and Attributable to Each Defendant

■ When imposing sentence for a drug offense, a district court is not limited to a consideration of the quantity of drugs actually seized or charged, but may consider any amounts that were part of a common plan of distribution, if those larger amounts were reasonably foreseeable and were part of the illegal activity the defendant joined. *United States v. Smith*, 13 F.3d 860, 864–65 (5th Cir.1994), *cert. denied*, — U.S. —, 114 S.Ct. 2151, 128 L.Ed.2d 877 (1994). At sentencing, the trial court found that the overall conspiracy involved more than 178 kilograms of cocaine. This total took into account the 84 kilograms of cocaine found in the Prestwood house, the four kilograms of cocaine in the denim bag abandoned by Serna, and an additional 90 kilograms represented by the $1.1 million in cash found at the Prestwood house. In accordance with the Sentencing Guidelines,[3] the trial court found that Fierro, Martinez and Ibanez were each accountable for 59 kilograms of cocaine, Serna was found accountable for 88 kilograms, and Grajales was found accountable for the full 178 kilograms. Fierro and Ibanez challenge the trial court's determinations of the amount of cocaine attributable to them.[4]

---

3. U.S.S.G. § 2D1.4; U.S.S.G. § 1B1.3(a)(1)(B) & note 2 ("With respect to offenses involving contraband (including controlled substances), the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.").

4. Grajales' brief does not challenge the quantity of cocaine attributed to him. Martinez challenges quantity in her brief, but she did not object to the quantity determination at sentencing; therefore she is not entitled to appellate relief. *See United States v. Guerrero*, 5 F.3d 868,

871 (5th Cir.1993) (holding that "questions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error."), *cert. denied*, — U.S. —, 114 S.Ct. 1111, 127 L.Ed.2d 422 (1994).

Similarly, we do not address Serna's challenge to the 88 kilograms of cocaine attributed to him, because he did not preserve this argument before the trial court below. Serna objected at sentencing only to the PSI's determination that he was responsible for the entire 178 kilograms (representing the money seized at the Prestwood house as well as the 88 kilograms seized). In his objections to the presentence report, Serna stated: "Defendant asserts that his guideline computa-

A district court's factual finding concerning the amount of drugs to be considered in sentencing a defendant will not be overturned absent clear error. *United States v. Rivera,* 898 F.2d 442 (5th Cir.1990). A finding is not clearly erroneous as long as it is plausible in the light of the record as a whole. *United States v. Shipley,* 963 F.2d 56, 58 (5th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 348, 121 L.Ed.2d 263 (1992). With regard to Fierro and Ibanez, the district court came up with 59 kilograms by adding together the figures contained in the drug ledgers seized from the French Road house and Ibanez's car. The government's expert witness testified that calculations in the ledgers included four cocaine transactions: one for eight kilograms, one for nine kilograms, one for 12 kilograms and one for 30 kilograms. We have examined the record, and we do not find clear error in the trial court's finding that Fierro and Ibanez may be sentenced on the basis of 59 kilograms.[5]

### B: Upward and Downward Adjustments for Roles in the Conspiracy

Grajales claims the trial court improperly enhanced his offense level by four levels upon finding that he was an "organizer

or leader" under U.S.S.G. § 3B1.1(a). Fierro claims that the trial court improperly enhanced his offense level by two levels upon finding that he was a "manager or supervisor" under U.S.S.G. § 3B1.1(c). Serna, although he did not object on this ground at sentencing, claims that the district court erred in not considering a downward adjustment of two to four levels based on his "minor" or "minimal" role in the conspiracy. U.S.S.G. § 3B1.2. Again, Serna is not entitled to appellate relief on this point, because questions of fact capable of resolution at sentencing can never constitute plain error. *United States v. Guerrero,* 5 F.3d 868, 871 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1111, 127 L.Ed.2d 422 (1994).[6]

When proper objection is made, a district court's finding of a defendant's role in the offense is reviewed for clear error. *United States v. Bethley,* 973 F.2d 396, 401 (5th Cir.1992). As we discussed above, the evidence introduced at trial was sufficient for the trial judge to find that Fierro was a manager or supervisor of Ibanez and Martinez in the drug distribution enterprise, and that Grajales was the organizer or leader of the overall operation. We have reviewed the

tion should be based on 87 kilograms and requests a hearing to resolve this matter." At the sentencing hearing, Serna's counsel reiterated this position, stating that "we would feel that [base offense] level 36 is the proper level, that the cocaine should be at that level 36, not a level 38." *See* U.S.S.G. § 2D1.1(c)(4) (Drug Quantity Table, showing a base offense level of 36 corresponding to a finding that 50 to 150 kilograms of cocaine were involved in the offense); *compare* § 2D1.1(c)(3) (a finding of 178 kilograms would have mandated a base offense level of 38).

The court sustained Serna's objection, finding that Serna was connected only to the cocaine seized at the Prestwood house, not with the money. In accordance with the court's ruling, the final judgment entered against Serna reflects an offense level of 36. Because Serna's objection to quantity at sentencing was determined in his favor and he did not make a further objection, we find that Serna may not make a further challenge to the quantity of cocaine attributed to him at sentencing. *Guerrero,* 5 F.3d at 871.

5. Ibanez also claims that a remand for re-sentencing is required because the trial court did not comply with Federal Rules of Criminal Procedure 32(c)(3)(D) by making explicit factual findings on each contested statement in his presentence report. We have reviewed the sentencing transcript, and we hold that the court com-

plied with Rule 32. *See United States v. Carreon,* 11 F.3d 1225, 1230–31 & n. 17 (5th Cir.1994) (noting that the district court is not required to "regurgitate" the facts to satisfy Rule 32 concerns).

6. Serna also argues that his attorney was ineffective at sentencing by failing to argue for a offense level reduction under § 3B1.2. Serna points to the trial court's statement that Serna should be sentenced "at the lower end of the guidelines because in my opinion, he was a courier whose responsibility it was to assist in the distribution." Serna says his trial counsel's failure to move for the level decrease, given these facts, was unreasonable. However, we have held that ineffective assistance claims cannot be resolved on direct appeal unless adequately raised in the district court. *United States v. McCaskey,* 9 F.3d 368, 380 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). We hold that the record in this case is not sufficiently developed with respect to the ineffective assistance claim to justify an exception to the general rule of non-review. *See United States v. Bermea,* 30 F.3d 1539, 1573 & n. 4 (5th Cir.1994). Serna remains free to pursue his claim of ineffective assistance in accordance with 28 U.S.C. § 2255.

evidence against Fierro and Grajales, and we hold that the trial court did not clearly err in making the upward adjustments due to their supervisory roles in the offense.

### C: Presence of a Weapon

Grajales challenges the increase of his offense level by two levels because of the presence of a weapon during the offense, pursuant to U.S.S.G. § 2D1.1(b)(1). This determination is also reviewed for clear error. *United States v. Menesses*, 962 F.2d 420, 428 (5th Cir.1992). The evidence shows that a 9mm pistol was found in a kitchen cabinet of the Prestwood house "three or four feet" from a "stack of cocaine." Grajales possessed a key to the house, had lived there for nine months and was present at the house on the day the cocaine and gun were seized. He was found to be the leader/organizer of the operation who was in charge of the cocaine and the money. There was no clear error in the § 2D1.1(b)(1) adjustment. *United States v. Webster*, 960 F.2d 1301, 1310–11 (5th Cir.) (gun in kitchen cabinet), *cert. denied sub. nom. Nelson v. United States*, — U.S. —, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992); *United States v. Villarreal*, 920 F.2d 1218, 1221 (5th Cir.1991) (handgun in kitchen drawer near where cocaine was stored).

### Cross–Appeal—Downward Departure for Grajales

Grajales' total offense level of 44 mandates a guideline range of life imprisonment. U.S.S.G. Chapter 5, Part A (Sentencing Table). However, the trial court departed downward and sentenced Grajales to 240 months, stating that it believed a 20–year sentence was long enough in light of the fact that the 43–year–old Grajales would be 64 or 65 when he got out of prison. The trial court stated that, when the defendant is in his forties, "20 years is life as far as I'm concerned."

A district court cannot depart from the guideline range unless it identifies "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission" in formulating the guidelines. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0.[7] Under U.S.S.G. § 5H1.1, a defendant's age is an improper basis for departure unless the defendant is "elderly and infirm" at the time of sentencing. Grajales' presentence report, however, states that "he currently enjoys generally good health and is neither under a doctor's care nor taking any medication."

The district court's comments at sentencing indicate that the departure may also have been motivated by letters from Grajales' family and from government officials, describing Grajales' character. However, character, family ties, family responsibilities and community ties are also improper grounds for departure. U.S.S.G. §§ 5H1.5, 5H1.6, 5H1.11; *United States v. O'Brien*, 950 F.2d 969 (5th Cir.1991), *cert. denied*, — U.S. ——, 113 S.Ct. 64, 121 L.Ed.2d 31 (1992); *United States v. Burch*, 873 F.2d 765, 768 (5th Cir.1989).

For these reasons, we hold that the downward departure for Grajales was improper, and we vacate Grajales' sentence and remand his case for re-sentencing within the guideline range.

### Conclusion

Therefore, for the reasons stated in this opinion, we AFFIRM the convictions of all defendants on all counts. We AFFIRM the sentences of defendants Fierro, Martinez, Serna and Ibanez. We VACATE the sentence of Grajales because of the trial court's improper downward departure and REMAND his case for re-sentencing.

---

**7.** The government and Grajales disagree on the proper standard of review for a trial court's departure from the sentencing range. We review the *degree or reasonableness* of a departure for abuse of discretion. However, whether the *ground for departure* is proper is a question of law reviewable *de novo* because it involves an interpretation of the Sentencing Guidelines. *United States v. Wilder*, 15 F.3d 1292, 1300 (5th Cir.1994); *United States v. White*, 945 F.2d 100, 101 (5th Cir.1991).