**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 93-7605

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIE JAMES POLK,
DERICK O. CARTER,
ROBERT WELCH and
RONALD McMILLIAN,

Defendants-Appellants.

---

Appeal from the United States District Court
For the Southern District of Mississippi

---

(June 16, 1995)

Before KING, EMILIO GARZA and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

The four defendant-appellants, Willie James Polk, Derrick O. Carter, Robert Welch and Ronald McMillian, were charged in a February 17, 1993 indictment with conspiracy and substantive offenses relating to their involvement in a crack cocaine operation based in Moss Point, Mississippi from 1989 to 1992. Several other conspirators were named in the indictment but did not go to trial with the appellants for various reasons. Dwight Earl Jackson pleaded guilty and testified at trial against the appellants. Mark

1

A. Thomas, a/k/a "Jim" -- who the evidence shows participated significantly in many of the drug transactions described below -- was granted a severance, and comments from the district court indicate that Thomas was under psychiatric treatment and was being evaluated for fitness to stand trial. Terry Anthony Austin, the brother of defendant-appellant Carter, was also granted a separate trial. Houston Chambers, who the evidence shows participated in the June 1992 Eialand Plaza drug transactions, pleaded guilty to one count and did not go to trial.

The alleged ringleader of the drug distribution enterprise, co-defendant Eric James a/k/a "Gold Dog," went to trial with the four appellants and was found guilty on all counts charged. However, James waived his right to appeal in exchange for a sentence reduction, so his convictions are not before us.

Appellants Polk, Carter, Welch and McMillian were convicted by a jury on June 11, 1993 of the following offenses:

! Count 1: Conspiracy to possess cocaine base with the intent to distribute from about 1989 to June 1992 in violation of 21 U.S.C. §§ 841(a)(1), 846 (Polk, Carter, Welch and McMillian);

! Count 3: Possession of cocaine base with intent to distribute on April 23, 1992, and aiding and abetting thereof, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 (McMillian);

! Count 5: Possession of cocaine base with intent to distribute on April 30, 1992, and aiding and abetting thereof, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 (McMillian);

! Count 6: Possession of cocaine base with intent to distribute on June 16, 1992, and aiding and abetting thereof, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 (McMillian and Carter);

! Count 7: Possession of cocaine base with intent to distribute on June 18, 1992 in violation of 21 U.S.C. § 841 (McMillian);

! <u>Count 8</u>: Possession of cocaine base with intent to distribute on or about June 22, 1992[1], and aiding and abetting thereof, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 (Welch);

! <u>Count 9</u>: Possession of cocaine base with intent to distribute on or about June 23, 1992, and aiding and abetting thereof, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 (Welch);

! <u>Count 10</u>: Carrying a firearm during and in relation to a drug trafficking crime "on or about June 23, 1992, and prior thereto," and aiding and abetting thereof, in violation of 18 U.S.C. §§ 2 and 924(c) (Welch).

The appellants were sentenced as follows: Polk received 292 months of imprisonment on Count 1. Carter received 262 months on Count 1 and 240 months on Count 6, to run concurrently. Welch received 235 months for Count 1, 235 months for Count 8 and 235 months for Count 9, to run concurrently, and a consecutive 60-month sentence on Count 10. McMillian received 262 months on Count 1 and 240 months each on Counts 3, 5, 6 and 7, to run concurrently.

---

[1]The two cocaine possession transactions for which Welch was convicted ("the Eialand Plaza transactions") were alleged to have occurred in Louisville, Mississippi within hours of each other, one before and one after midnight. The indictment shows a date of June 22, 1992 for the Count 8 transaction and a date of June 23, 1992 for the Count 9 transaction. However, the evidence showed that the transactions actually took place on June 23 and June 24, 1992. The firearm possession charge in Count 10 relates to one or both of these transactions. The prosecutor argued to the jury that "if [the dates in the indictment] are off by a day or two, that's for you to decide. I mean, if you're satisfied that the evidence supports those transactions that occurred according to the witnesses' testimony, the fact that the grand jury might be off a day or two is not something which would be dispositive unless you think that -- that relates to your decision in some way." The district court instructed the jury: "You will note that the indictment charges that the offense was committed on or about a specified date. The government does not have to prove that the crime was committed on that exact date, so long as the government proves beyond a reasonable doubt that the defendants committed the crime on a date reasonably near the date stated in the indictment."

All four defendant-appellants have appealed their convictions, raising various grounds for reversal. None of the appellants raises sentencing issues in this appeal.

FACTUAL BACKGROUND[2]

The four defendants grew up knowing one another in the same neighborhood in Moss Point, Mississippi, near the intersection of Barnett and Church streets. James/"Gold Dog" owned a house on Barnett Street nicknamed "the camp" that in the years 1989 to 1992 was a site for sales of crack cocaine. The small, run-down Barnett Street house had beds, electricity and phone service but no water or gas. There was a high chain-link fence within 18 inches of the house, and pit bulls were maintained as guard dogs. One witness testified that the camp was a crack house run in shifts and open 24 hours a day. A Volkswagen van was parked in the yard. There was testimony that Polk, Carter, Welch, McMillian and others sold crack from the house, from the van and elsewhere, sometimes returning the money they received to James, and that guns were kept in the van to protect the drugs. One witness testified that the eight or nine people working for James at the Barnett Street house would sell about a kilogram of cocaine every two weeks. In the spring and early summer of 1992, government agents made several undercover drug purchases at the Barnett Street address, using two confidential informants. Some of the transactions were tape-recorded, and videotape was taken on at least one occasion.

---

[2]Because this is a sufficiency of the evidence review, the facts are stated in the light most favorable to the government.

4

Evidence showed that James obtained large shipments of cocaine from Houston, converted it to crack and distributed it through street-level dealers in Moss Point, Mississippi and other communities. An airport narcotics officer testified that in 1991 narcotics officials at the New Orleans Airport seized more than $30,000 in cash from James and three other people who had bought cash one-way tickets to Houston and fit the drug profile. The money was forfeited without protest from James.

In a challenged evidentiary ruling, the court admitted evidence about an undercover operation in Laurel, Mississippi on July 24, 1992 in which James arranged to buy five kilograms of cocaine for $110,000 from a "source" who was actually an undercover officer. The court instructed the jury that the evidence of the five-kilogram transaction related only to James and could not be used in any way against defendant-appellants Polk, Carter, Welch or McMillian. James and several other people, including co-conspirator/government witness Cedric Carter, were arrested, were charged and pleaded guilty in a separate case in relation to the July 24, 1992 five-kilogram transaction.[3]

The evidence showed that James did not live in the Barnett Street house; he lived in a larger, well-kept rented house on Griffin Street in Moss Point. However, there was testimony that

---

[3]The evidence of the events of July 24, 1992 was introduced in the instant case, over James' double jeopardy objection, to prove the government's charge in Count 12 that James had enticed a minor, his 16-year-old nephew, to become involved in a drug transaction. James was convicted in Count 12 and in Count 2 for maintaining a house for the purpose of distributing cocaine. As noted above, James did not appeal these convictions.

James visited the Barnett Street house every day to collect money from the drug sales. Government surveillance established that all drug activity ceased at the Barnett Street house after July 24, 1992, the day James was arrested and taken into custody.

DISCUSSION

Sufficiency of the Evidence Issues

All four defendant-appellants challenge the sufficiency of the evidence to support their convictions on Count 1, conspiracy. Carter, McMillian and Welch challenge the sufficiency of the evidence to support their convictions on the individual substantive cocaine possession offenses in Counts 3, 5, 6, 7, 8 and 9. Welch challenges the sufficiency of the evidence to support his conviction in Count 10 for using or carrying a firearm in connection with a drug offense. All defendants preserved the sufficiency issues at trial by moving for judgments of acquittal on all counts, both after the government rested and after all defendants rested.

We find that the evidence introduced at trial was sufficient to support the convictions of Polk, Carter, Welch and McMillian in Count 1 (conspiracy), and of McMillian in Counts 5, 6 and 7 and of Welch in Count 8 (possession with intent to distribute), and we therefore affirm those convictions. However, for the reasons we discuss below, we find that the evidence was insufficient to support the convictions of McMillian in Count 3, Carter in Count 6 and Welch in Counts 9 (possession with intent to distribute) and of

6

Welch in Count 10 (use/carrying of firearm in relation to a drug crime), and we therefore reverse those convictions.[4]

The elements of a drug conspiracy are: (1) the existence of an agreement to possess narcotics with the intent to distribute, (2) knowledge of the agreement, and (3) voluntary participation in the agreement. United States v. Fierro, 38 F.3d 761, 768 (5th Cir. 1994), cert. denied, 115 S. Ct. 1431 (1995); United States v. Mergerson, 4 F.3d 337, 341 (5th Cir. 1993), cert. denied, 114 S. Ct. 1310 (1994). The jury may infer a conspiracy from circumstantial evidence and may rely upon presence and association, along with other evidence. Proof of an overt act in furtherance of the conspiracy is not required; a common purpose and plan may be inferred from a development and collection of circumstances.

---

[4]In some cases, a defendant who participates in a conspiracy may be "deemed" guilty of substantive counts, such as possession, committed by a co-conspirator in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 645 (1946); United States v. Crain, 33 F.3d 480, 486 n.7 (5th Cir. 1994), cert. denied sub nom. Watkins v. United States, 115 S. Ct. 1142 (1995); United States v. Basey, 816 F.2d 980, 997-98 (5th Cir. 1987). However, a substantive conviction cannot be upheld solely under Pinkerton unless the jury was given a Pinkerton instruction. Crain, 33 F.3d at 486 n. 7; United States v. Sanchez-Sotelo, 8 F.3d 202, 208 (5th Cir.1993) ("Since the district court did not instruct the jury [under Pinkerton], proof of the conspiracy alone will not sustain the possession charge against Sotelo."), cert. denied, 114 S. Ct. 1410 (1994); Basey, 816 F.2d at 998. Basey held that, at a minimum, a proper Pinkerton instruction should state clearly that the defendant can be convicted of a substantive crime committed by his co-conspirator in furtherance of the conspiracy. Basey, 816 F.2d at 998 & n. 35. The jury in this case was not given such an instruction. Therefore, even though we have affirmed each appellant's conviction on the conspiracy count, the individual substantive convictions must stand or fall on the government's evidence against the individually charged defendant regarding that particular count. Crain, 33 F.3d at 486; Sanchez-Sotelo, 8 F.3d at 208.

7

<u>Fierro</u>, 38 F.3d at 768; <u>United States v. Robles-Pantoja</u>, 887 F.2d 1250, 1254 (5th Cir. 1989). On a sufficiency review, the appellate court must consider all evidence in the light most favorable to the guilty verdict and accept all reasonable inferences tending to support the verdict. The ultimate inquiry is whether a rational trier of fact could have found guilt on each count beyond a reasonable doubt. <u>Fierro</u>, 38 F.3d at 768; <u>United States v. Huntress</u>, 956 F.2d 1309, 1318 (5th Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 2330 (1993).

To sustain a conviction for possession with intent to distribute, the government must show that the defendant (1) knowingly (2) possessed contraband (3) with the intent to distribute it. <u>United States v. Garcia</u>, 917 F.2d 1370, 1376 (5th Cir. 1990). Even if actual possession is not shown, a conviction may rest on proof of "constructive possession," which exists when the defendant has ownership, dominion or control over the contraband or over a vehicle where it was found. <u>Id</u>.

To sustain a conviction for aiding and abetting under 18 U.S.C. § 2, the government must show that a defendant associated with a criminal venture, purposefully participated in the criminal activity, and sought by his or her actions to make the venture succeed. <u>United States v. Jaramillo</u>, 42 F.3d 920, 923 (5th Cir. 1995), <u>cert. denied</u>, 1995 WL 251644 (May 22, 1995); <u>Fierro</u>, 38 F.3d at 768; <u>United States v. Ledezma</u>, 26 F.3d 636, 641 (5th Cir.), <u>cert. denied sub nom. Zajec v. United States</u>, 115 S. Ct. 349 (1994). To aid and abet simply means to assist the perpetrator of

8

a crime with some affirmative act designed to aid the venture, while sharing the requisite criminal intent. <u>Jaramillo</u>, 42 F.3d at 923. Mere presence and association, however, are not alone enough to sustain a conviction for aiding and abetting. <u>Id</u>.

The bulk of the government's conspiracy evidence at trial came from the testimony of two "cooperating witnesses" -- Dwight Earl Jackson ("Jackson") and Cedric Darnell Carter ("Cedric").[5] Both Jackson and Cedric grew up in the same neighborhood as James and the appellants, and both admitted to using crack cocaine and selling crack for James at the Barnett Street house. Jackson was initially indicted along with the appellants, but he pleaded guilty and testified pursuant to a plea agreement. Cedric pleaded guilty to conspiracy to possess cocaine in a separate case involving James and the five-kilogram transaction. On cross-examination, Cedric said he was testifying in this trial at the request of the prosecutor and in the hope that he might get a sentence reduction.

Jackson testified that he has known James all his life and that he spent a lot of time at the Barnett Street house from 1990 to 1992, selling crack cocaine for James. He testified that Polk, Carter, Welch and McMillian also sold crack cocaine for James at the Barnett Street house during that time period. Cedric said he spent time around the Barnett Street house in June and July of 1992. After working for James at the James' nightclub, "America's Most Wanted," Cedric started to sell crack cocaine for James.

---

[5]We refer to co-conspirator/government witness Cedric Darnell Carter as "Cedric" to avoid confusion with defendant-appellant Derrick O. Carter ("Carter"). The two Carters are not related.

Cedric said that at this time he was smoking crack "like a broke chimney," and that he bought crack from and sold crack to Carter and McMillian, and to a lesser extent Polk, but not from Welch.

All four defendant-appellants argue that the testimony of Jackson or Cedric, or both, was not credible, and indeed the two witnesses contradicted themselves and each other at several points. However, we note that non-credibility is generally not a sound basis for alleging insufficiency of the evidence on appeal; it is the jury's function to determine credibility. United States v. Bermea, 30 F.3d 1539, 1552 (5th Cir. 1994), cert. denied sub nom. Garza v. United States, 115 S. Ct. 1825 (1995). Defense counsel cross-examined Jackson and Cedric vigorously on their inconsistent statements, prior criminal conduct, drug use, government promises and possible inducements for them to lie or exaggerate. To the extent the appellants challenge sufficiency by attacking the government witnesses' credibility, their arguments on this point are without merit. See Bermea, 30 F.3d at 1552 (holding that "a guilty verdict may be supported only by the uncorroborated testimony of a coconspirator, even if the witness is interested due to a plea bargain or promise of leniency, unless the testimony is incredible or insubstantial on its face.").

The following evidence relating to the conspiracy and possession counts was introduced against each of the defendant-appellants:

10

Evidence against Willie Polk:

Jackson identified Polk in the courtroom, testified that he knows Polk's father and has been friends with Polk all his life, and said that Polk's nickname is "Spring." Jackson testified that during the years 1990 to 1992, Polk stayed at the house on Barnett Street (which was called the "camp") and sold crack for James out of the house and out of the Volkswagen bus in the front yard of the house, at various times during all three around-the-clock "shifts." Jackson said Polk was "the one who made [Gold Dog] what he is today," and that Polk "sold more dope for [Gold Dog] than anybody." Jackson testified that Polk was trusted at the camp, knew where the drugs were hidden, was known and trusted by the guard dogs at the house, and sometimes borrowed cars from James. Jackson also testified that he had seen Polk at James' nightclub "America's Most Wanted," and at James' residence on Griffin Street, and that Polk was trusted enough to have access to the Griffin Street house to pick up drugs. Jackson testified that Polk at some point was also a crack user.

Jackson identified Polk as one of the men who posed in a photograph with James and another man. In the photo, Polk is holding a pistol, wearing sunglasses and standing in front of a junior high school next to James, who was holding a pile of money. Jackson said the photo was "when Gold Dog first made $10,000. He got together and brought all his money up ... and get a couple of the guys that work for him, [and] they take a picture." Polk's attorney argued to the jury that the man in the photograph next to

11

James was not Polk and in fact looked about 6 inches taller than Polk, but the jury had a chance to look at the photograph and to look at James and Polk standing next to each other in the courtroom. In closing arguments, the prosecutor argued that the photo showed the men leaning on a car, which could make a difference in their apparent heights.

Polk was identified by ATF Agent Bobby Wright as being present at the April 28, 1992 transaction in which the confidential informant ("CI") bought $130 worth (1 gram) of crack cocaine from co-indictee Mark Thomas. Wright was not the CI but was doing surveillance that day and personally saw Polk at the transaction. Wright, who monitored the transaction through the CI's body wire, said it is Polk's voice on the tape of the April 28 transaction talking about "no one bought any last night," after Thomas threatened to kill Polk if Polk didn't give Thomas his money.[6]

Agent Wright testified that, while in plain clothes, he called Polk "Spring" on the street and Polk answered him, thus verifying that Spring was Polk's nickname. Agent Wright also verified the alias with records from the Moss Point Police Department. On an ATF surveillance videotape taken on April 30, 1992 at the Barnett Street house, an unknown woman accompanied by a child calls out for

---

[6]As we note later in this opinion, McMillian and Polk were originally charged in Count 4 with possession of cocaine base with the intent to distribute in connection with the April 28 transaction, but the trial court granted McMillian's and Polk's motions for acquittal on that count. Therefore, the evidence regarding the April 28 transaction is relevant only to the conspiracy count.

either "Spring" (according to Wright) or "Frank" (according to Polk's counsel).[7]

Cedric testified that he went to school with Polk, grew up with him and calls him "Spring." During a break in Cedric's testimony, Cedric borrowed a cigarette from Polk. Cedric, who said he used to be a heavy crack cocaine user, testified that he had both bought crack from and sold crack to Polk at the camp. (Later Cedric contradicted himself and stated that he didn't sell Polk any drugs, but that he occasionally would give Polk a few $20 rocks of crack in exchange for Polk's protecting him, i.e., "watching [Cedric's] back," and that Polk didn't sell drugs for James at the camp, but that Polk would occasionally sell Cedric a $20 rock.) Cedric also identified Polk as the man in the photo with James.

Evidence against Derrick Carter:

Jackson identified Carter in the courtroom and testified that he has known Carter all his life and that Carter's nickname is

---

[7]Polk and McMillian claim that the trial court erred in allowing Agent Wright to give his own interpretation of what name the woman spoke. During the showing of the tape, the agent stated, "Here the young lady is hollering out for `Spring.'" Polk and McMillian claim that the spoken word was actually "Frank," and that it was improper to allow such opinion testimony by a lay witness. The evidence did not show anyone connected with the case named Frank. When objection was made at trial, the court stated that the defense could argue its own interpretation of the tape on cross-examination. Polk's counsel did so, and played the tape again so the jury could determine what name was spoken. The jurors were instructed that their own recollection of the tapes was to control their deliberations, and there is no indication that the jurors failed to understand or follow that instruction. In addition, we note that Wright was the officer operating the video camera on that date, and he had personal knowledge of what he heard. We find no error.

"Doo-Doo." Jackson testified that during the years 1990 to 1992, Carter sold crack cocaine out of the Barnett Street house, and out of the van in front of the house, on behalf of James. Jackson testified that he also saw Carter selling drugs "from the camp to the village," referring to Carver Village in Pascagoula, Mississippi. Jackson also identified the house at 4501 Church Street where Carter lived, within walking distance of the "camp," and testified that Carter also sold crack from that house, often when the police were watching the Barnett Street house. Jackson identified a orange/brown 1981 Honda Civic in a photograph as Carter's car, and stated that James bought the car for Carter at an auction. Agent Wright also identified the car in the photograph as belonging to Carter, and the government introduced license tag registration documents showing that the Honda was registered to Derrick Carter at 4501 Church Street. Wright also testified that Carter lived at the Church Street house and identified the house from a photograph.

Cedric identified Carter in the courtroom and testified that he knows Carter and Carter's mother, and that Carter's nickname is "Doo-Doo." Cedric testified that in 1991 and 1992, when he was a heavy crack cocaine user, he bought crack from Carter and others at the Barnett Street house. In June 1992, Cedric was selling cocaine for James at the camp, and he testified that Carter was one of his customers who bought "cookie" amounts large enough to break up and re-sell at a profit. Cedric also testified that Carter was among those who came to the Barnett Street house to hang around and play

14

cards or basketball, and that he also saw Carter at James' nightclub, "America's Most Wanted."

Wright testified that on June 16, 1992, he sent two confidential informants to the Barnett Street house to make a controlled purchase of crack cocaine. The two CIs found no one present at the house, and as they turned around to leave, the Honda Civic identified as belonging to Carter pulled up in front of the Barnett Street house. Two men were in the Honda, an "unidentified black male" and another man who Wright identified as McMillian. Wright said McMillian got out of the car and recognized one of the CIs as a person who had previously bought crack cocaine at the Barnett Street house. Wright testified that McMillian said the police were watching the Barnett Street house, so they had shut down operations there, but McMillian told the CIs to get back in their car and follow the Honda down the block to the house at 4501 Church Street (Carter's residence), where the CIs purchased $300 worth (4 grams) of crack cocaine. Wright monitored the entire encounter and transaction via a body wire on one of the CIs. Later on the same day, the same car, Carter's Honda Civic, was seen and photographed parked in front of James' house on Griffin Street. The photograph was entered into evidence.

The "unidentified black male" who was in Carter's car along with McMillian during the June 16 drug transaction was never positively identified as being Carter or anyone else. One of the CIs at first incorrectly identified the man as co-indictee Terry Anthony Austin, Carter's brother. But Agent Wright confirmed on the

stand that this identification had to be wrong, because Austin was incarcerated on that date.

ATF Agent James Render was working with Wright on June 16, 1992. Render confirmed the circumstances of the drug purchase at 4501 Church Street, and testified that he took the photograph of Carter's car in front of James' house. A Buick Regal belonging to co-indictee Mark Thomas is also parked in front of James' house in the same photograph.

The government introduced into evidence a service agreement indicating that Derrick O'Neal Carter of 4501 Church Street purchased a pager on November 1, 1991. The document lists Carter as a student and his "type of business" as "America's Most Wanted Game Room," the nightclub owned by James. The pager service agreement also lists Carter's phone number as 475-9640, which a phone company witness later confirmed was the phone number at the Barnett Street house. Carter's attorney argued to the jury that no one testified to seeing Carter with a pager, and that anyone could fill out such an application with someone else's name on it.

In a evidentiary ruling challenged by Carter, the district court allowed Moss Point Police Officer John Gaffney to testify about a search warrant executed at 4501 Church Street on April 28, 1993 (about a year after the charged conspiracy). The evidence was admitted under Federal Rule of Evidence 404(b), and the court instructed the jury not to consider the evidence to prove that Carter had a bad character and thus committed the acts charged, but to consider it only to prove intent or lack of mistake or accident.

16

Gaffney testified that he entered the Church Street house to execute the search warrant, he found Carter in the northeast bedroom, standing in the center of the room and jumping toward a bed. In that bedroom, officers found a plastic medicine bottle containing a small rock of crack cocaine. In a hole in the floor near where Carter had been standing, officers found two plastic bags containing 78.9 grams of crack cocaine. Carter was not found to be carrying any drugs, and at least one of the other two occupants of the house had recently been in the area where the drugs were found. Carter told the officers on that day that he no longer lived in the house, but bills and mail addressed to him, as well as clothing his size, were found in the northeast bedroom. Also in that bedroom was an asthma bottle identical to one in the possession of Carter, who has asthma.

Evidence against Robert Welch:

Jackson identified Welch in the courtroom and said he went to school with Welch's brother. Jackson testified that during the years 1990 to 1992, Welch sold crack cocaine out of the Barnett Street house, and out of the Volkswagen bus in front of the house, on behalf of James. Jackson testified that Welch at first sold crack for co-indictee Thomas, then Welch began selling for James instead because he could make more money that way. Jackson said he had seen Welch at James' nightclub, "America's Most Wanted." Jackson said he never saw Welch with a pager, but he has seen him with a pistol at the Barnett Street house. Jackson said that in the

17

summer of 1992, he didn't see Welch around the Barnett Street house because Welch "was in north Mississippi working."

Cedric identified Welch in the courtroom and said he calls Welch by his nickname, "Gook," but he doesn't know Welch very well. Cedric said he bought crack at the Barnett Street house in the years 1990 to 1992, but not from Welch. When Cedric started selling crack cocaine, he never sold any to Welch, either. Cedric said he saw Welch at the Barnett Street house "every now and then," to drink beer or shoot dice, "just kicking around." He never saw Welch with a firearm, and he never saw Welch involved in a drug transaction.

Agent Wright testified that none of the undercover cocaine purchases at Barnett Street involved Welch, although Wright had seen Welch at the Barnett Street house during the investigation. Wright said Welch was not identified as being a part of the James conspiracy until he was arrested in Winston County with co-indictees Mark Thomas and Houston Chambers.

Officer Mike Perkins of the Louisville, Mississippi police department testified that he had watched Welch get off the bus in Louisville, Mississippi seven or eight times in the spring and early summer of 1992. Louisville is about five hours away from Moss Point. Welch was being watched in connection with an investigation into narcotics dealing in the Eialand Plaza Apartments in Louisville. Officers believed Welch was making trips from Moss Point to Louisville to deal in crack cocaine. At least seven

18

confidential informants had described Welch to police, and Welch had been followed from the bus stop to the apartments on several occasions.

Officer David Porter testified that he and a CI went to the Eialand Plaza Apartments on June 23, 1992 and attempted to make an undercover purchase. No purchase was made, but Porter talked to resident Annie Steele and saw Welch, Thomas and Chambers together, talking and walking away. Later that evening, officers sent another confidential informant, Chris White, to the apartments, and White made two undercover purchases of crack cocaine, one late on June 23, 1992 and the other just after midnight on June 24, 1992.

White, the CI who made the two purchases, testified that officers contacted him and asked him if he could make an undercover purchase from Welch and Chambers. White knew that he could do so because he was a former crack cocaine user and had bought cocaine from Welch about four or five times before. White described the two transactions; he said that when he approached that evening to make the first buy, Welch was standing on the breezeway at the top of the stairs, and Welch said, "that's Chris, he's cool," and sent White downstairs to Annie Steele's apartment where Thomas was, and White purchased a cocaine rock from Thomas. White said he knew Welch, but he had seen Thomas only once, earlier that same day. White said he couldn't tell exactly who Welch was addressing when he said "he's cool," because "it was rather dark under the porch." The government argues that Welch aided and abetted the drug transaction by "vouching" for White, who Thomas did not know, so

19

that White could purchase cocaine.

White testified that when he was sent back after midnight to make a second purchase, Chambers was standing on the stairs near where Welch had been, and Chambers sold White the second cocaine rock.

Officer Porter was in a van about 125 feet away monitoring the transactions via the CI's body wire. During the first transaction, Porter said he heard White say over the wire that he was approaching the apartment, then he heard White going up some stairs and asking someone if he could "get something." Porter testified that he heard someone say, "he's cool" and instruct White to go downstairs. White then entered an apartment to make the purchase, and Perkins couldn't hear anything after that because of loud music being played in the apartment. White purchased a 0.06-gram rock and returned. After the first purchase, officers secured a search warrant for the apartment where the cocaine had been sold. Porter said the second purchase, of a 0.12-gram rock, was made just after midnight on June 24. Officer Porter again listened via the body wire, and determined that neither Welch nor Thomas was present during the second transaction and that the purchase was made from Chambers. Shortly after the second purchase, officers executed the search warrant. As officers entered the apartment, Perkins testified, Chambers ran out and tried to throw away a bag. Chambers was arrested, and the bag was retrieved and found to contain 67 rocks (5.14 grams) of crack cocaine. Welch and Thomas were not at the apartment when the search took place. White, the CI, provided

a description of Welch, Thomas and Chambers and the license plate number of the car they had been seen in earlier in the day. On information from another Louisville police officer, Perkins went to Welch's uncle's house, about a mile away from the apartment, to seek Welch and Thomas. The two were found inside asleep on the couch. Officers obtained permission from Thomas to search his 1981 Buick Regal parked outside the house, which bore the license number the CI had provided. The car was actually registered to Thomas' mother, but Thomas was known to drive it regularly and had received a traffic citation while driving it that same day. In addition, a photograph introduced into evidence showed Thomas' Buick Regal on another date parked under the carport at James' residence on Griffin Street. Officers searching the car found two loaded pistols in the glove compartment[8] and three bundles of cash totaling $3,000 wrapped with rubber bands and hidden under the car stereo speaker. The two weapons were dusted for fingerprints, but no identifiable prints were found on either one. The $20 buy money from the second purchase was found in Chambers' pocket, and the $20 buy money from the first purchase was found in Thomas' pocket, along with about $1,200 in additional cash. No drugs or buy money were found in Welch's possession. Welch, Thomas and Chambers were all arrested on state narcotics charges and placed in the Winston County Jail in

---

[8]There was some indication that the glove compartment where the guns were found was locked. On direct examination, Officer Perkins stated only that the guns were found "in the glove box," but on cross examination, counsel for Welch asked Perkins if he "found two pistols locked in the glove compartment of Mark Thomas's vehicle," and Perkins answered, "that's correct."

the Louisville area. Perkins then spoke with Agent Wright of the ATF about Wright's knowledge of Welch, Thomas and Chambers, and Perkins testified that the Louisville police chose not to pursue the state charges because a federal investigation was ongoing.

Annie Steele, who lived in the apartment where the two purchases were made, testified that Welch, Thomas and Chambers were selling drugs out of her apartment during the day before the police executed the search warrant. Steele said she had previously been buying crack cocaine from Welch every time Welch came to town. Steele estimated that from 1989 to 1992 she bought cocaine from Welch more than 20 times. She said Welch would come to Louisville two or three times a month and stay "long enough to get rid of his stash." Steele said Welch would bring the cocaine to town and sell it from her apartment and other places in Louisville. She said Welch would often bring other men, "his partners," with him to Louisville. Steele said that on June 23, 1992, Welch came over to Steele's apartment with Thomas and Chambers, who Steele didn't think she had met before. Steele said Welch asked her if the three could "hang out for a while, you know, and I told them sure, come on in." In exchange, the three gave Steele some crack to smoke. Steele said she knew White (who later became the CI) pretty well and used to smoke crack with him. On cross-examination, Steele admitted that when she gave a statement to the police after her arrest on June 24, she didn't mention that she had bought cocaine from Welch before.

Jail records show that Welch was in the Winston County Jail

22

from June 24, 1992 to August 12, 1992. Thomas paid a bond and was released on June 26. Chambers at some point was transferred to federal custody, but the date this occurred was not clear from the testimony. Telephone records were introduced into evidence showing phone calls to and from the telephone at the Barnett Street house and the Louisville area. On June 22, 1992, an operator-assisted phone call was made from a telephone in the Eialand Plaza Apartments to the Barnett Street number. On June 24, 25 and 26, 1992, there were 15 operator-assisted collect phone calls from the Winston County Jail "inmate area bullpen" to the Barnett Street number. From July 8 to 13, 1992, five calls were made from the Barnett Street number to the Winston County Jail. On July 8, 1992, two additional calls were made to Louisville from the Barnett Street number, one to the Winston County Circuit Clerk and one to a G.J. Fulton in Louisville. Winston County records show that Welch was released on August 12, 1992 when his state charges were dismissed for "insufficient probable cause." Perkins testified that he didn't present all of his evidence against Welch at the hearing on the state charges, because he had already talked to Agent Wright and planned to defer to the federal prosecution.

Evidence against Ronald McMillian:

Jackson identified McMillian in the courtroom and testified that during the years 1990 to 1992 he remembers that McMillian -- who Jackson knew only by his nickname, "Bootsie" -- sold crack cocaine out of the Barnett Street house, and out of the Volkswagen bus in front of the house, on behalf of James. Jackson identified

23

McMillian and James in part of the ATF surveillance videotape taken of the Barnett Street house from the woods across the street on April 30, 1992. In the portion of the video that Jackson viewed, McMillian is leaning on a fence about 30 feet away with his back turned to the camera.

Cedric identified McMillian in the courtroom and testified that he went to school with McMillian's mother and that McMillian's nickname was "Bootsie." Cedric said that in the years 1990 to 1992 he bought cocaine from McMillian at the Barnett Street house. In June 1992, Cedric sold cocaine at the house for James and claimed that McMillian was one of his customers who bought "cookie" amounts large enough to break up and re-sell at a profit.

Agent Wright testified regarding four undercover crack cocaine purchases for which McMillian was charged and convicted. The government did not introduce any testimony from either of the confidential informants who made the purchases. Instead, Agent Wright described the transactions from what the CIs told him, from his own observations through audio and visual surveillance, and from additional information in the investigation. Wright testified that on April 23, 1992, the CI, Thomas Walker, bought $110 worth (1.2 grams) of crack cocaine from Mark Thomas in the front yard of the Barnett Street house near the Volkswagen van. Wright monitored the transaction through the CI's body wire, and the transaction was also tape-recorded. The cassette tape recording and a transcript of that recording prepared by Wright were introduced into evidence. The government claims in its brief before this Court that

"McMillian could be heard speaking during the sale," but the record contains absolutely no evidentiary support for this claim. The government introduced no evidence that might connect McMillian to the April 23 transaction. The only voices identified on the transcript were those of Thomas and the CI. No one testified that McMillian participated in the April 23 transaction, aided that transaction in any way, or was even present at the Barnett Street house that day. However, McMillian was charged and convicted in Count 3 of the indictment in connection with the April 23 sale.

Agent Wright testified that on April 28, 1992, two CIs, Walker and Victor Upshaw, went to the Barnett Street house and purchased 1 gram of crack cocaine from Thomas. The transaction was monitored by Wright via a body wire and was tape-recorded, and Wright prepared a transcript of the tape. Wright testified that he also watched this transaction from across the street in the woods and that he saw McMillian at this transaction, but the only voices identified on the transcript are those of Thomas, Polk and the two CIs. McMillian, along with Polk, was originally charged in Count 4 in connection with the April 28 transaction, but the trial court granted McMillian's and Polk's motions for acquittal on that count.

Wright testified that on the morning of April 30, 1992, the CI Walker went to the Barnett Street house to make a purchase, but found no one there. At about 5 p.m. the same day, Wright said, Walker went back to the house to attempt a purchase while Wright listened by wire and videotaped the transaction from across the street. The April 30 transaction was also tape-recorded and

transcribed. According to the transcript and to Wright's testimony, McMillian and a person named "Julio" or "Toot" conducted the transaction. The three men went inside the house, and Wright continued to listen to the transaction, although he could no longer watch. On the tape and transcript, McMillian asks the CI, "You ain't got no mic's or nothing, do you?" Walker answers, "Nall brother, I'm cool," and McMillian responds, "You know I got to make sure." Wright testified that at this point McMillian searched the CI to look for microphones, but on cross-examination Wright admitted that he did not witness the search because the men were inside the house at this point. Wright also testified that the pat-down of the CI's body could be heard over the wire. The CI did not testify. On the tape, after Julio/Toot and Walker discuss the price for the cocaine, the CI said, "I don't blame you. I do the same thing, search them when they come up on me. I say, hey, let me check you out, brother." In response, McMillian says, "Uh." Wright testified that Walker bought $200 worth (2.4 grams) of crack cocaine from Julio/Toot at the April 30 transaction. The surveillance videotape taken on April 30 was also played for the jury and introduced into evidence. The events described in Wright's testimony are difficult to identify from viewing the video itself, because of erratic movements of the camera, obstruction from grass and trees and the distance from which the events were viewed. The video generally shows people, including the CI, coming and going from the Barnett Street house in the morning, and Wright testified that the people would leave after finding no one there to sell

26

cocaine. On the videotape, a woman calls out for either "Spring" or "Frank." Wright and Jackson identified McMillian and James as being present in the video. Wright testified that the video shows the CI returning at 5 p.m. and talking to McMillian in front of the house, then McMillian goes into the back door of the house while the CI waits outside. Then, Wright testified, the CI talks with Julio/Toot and Thomas, then all three men go inside the house, where Wright testified that McMillian performed the search. After the CI leaves with his cocaine, Wright testified, McMillian returns to his position in the Volkswagen van. Later, a woman who came to the house earlier when no one was home drives up, walks over to the van, then gets into her car and leaves. McMillian's counsel argued that, at most, the video shows McMillian engaged in such innocent acts as leaning on a fence, getting into the van and getting out of the van. McMillian was charged and convicted in Count 5 in connection with the April 30 transaction.

Wright also testified about the June 16, 1992 transaction, described above with reference to Carter, in which McMillian and another man in Carter's car led the confidential informants down the block to 4501 Church Street, where the CIs purchased $300 worth (4 grams) of crack cocaine. That transaction was monitored via body wire, and Wright had the video camera with him that day, but no tape recording, transcript or videotape of the June 16 transaction was entered into evidence. Wright said McMillian explained to the CI that the transaction was moved to the Church Street house because the police had been watching operations at the Barnett

27

Street house. Again, the CI did not testify. McMillian, along with Carter, was charged and convicted in Count 6 in connection with the June 16 transaction.

Wright testified that on June 18, 1992, the CI Walker again went to the Barnett Street house to make an undercover purchase. Wright testified that McMillian "directed Thomas Walker to an unidentified black male" to make the purchase, although this is not apparent from the tape or transcript. Wright said that Walker purchased $250 worth (2.6 grams) of crack cocaine, and the transaction was tape-recorded and transcribed by Wright. The voices of McMillian, Thomas and "Julio" are identified on the transcript. In the June 18 transaction, the man identified on the transcript as McMillian was present and talking to the CI about the June 16 sale at the Church Street house and asking how much Walker made from that piece of cocaine. The transcript included the following exchange:

```
Walker (CI):    I went around to the other place man.
McMillian:      Where?
Walker:         Over on, what that street down there?
McMillian:      Church Street.
Walker:         Yeah, where we went the last time.
McMillian:      Oh, oh.
Walker:         You back over here?
McMillian:      Yeah man.
```

On the tape, the man identified on the transcript as "Julio" names the price and appears to make the actual sale. McMillian was charged and convicted in Count 7 in connection with the June 18 transaction.

Agent Wright explained how officers were later able to identify McMillian as the man the CI had dealt with and the person

28

Wright had seen while performing surveillance. Around August 6, Wright recognized McMillian in a car and asked a marked police car to stop him and ask for identification. Wright testified that the identification, as well as a license plate check on the car, confirmed McMillian's identity.

<u>Sufficiency on Conspiracy Count</u>

We hold that the evidence was sufficient to support the jury's conviction of Polk in Count 1 for conspiracy to possess cocaine with the intent to distribute. Jackson testified that Polk was a trusted seller of crack cocaine for James. Three witnesses, Jackson, Cedric and Agent Wright, identified Polk in a photograph holding a pistol and standing next to James while James held a pile of money. Wright's testimony and the audiotape showed that Polk was present at a crack cocaine transaction on April 28, 1992 and talked about the fact that no one had bought any cocaine the night before.

We hold that the evidence was sufficient to support the jury's conviction of Carter in Count 1 for conspiracy to possess cocaine with the intent to distribute. Jackson and Cedric both testified that Carter sold crack cocaine at the Barnett Street house, at the Church Street house and elsewhere. Jackson testified that Carter worked for James and that James bought Carter a car. Carter's residence and his vehicle were involved in a crack cocaine transaction on June 16, 1992. Carter's car was photographed in front of James' residence along with Thomas' car. The jury saw a pager service agreement bearing Carter's name and address, showing his place of business as James' nightclub and his phone number as

29

the Barnett Street number.

We hold that the evidence was sufficient to support the jury's conviction of Welch in Count 1 for conspiracy to possess cocaine with the intent to distribute. Jackson testified that Welch sold crack cocaine for Thomas, then for James. Steele testified that Welch would travel to Louisville with his "stash" and sell crack to her. White also testified that he bought crack from Welch in Louisville.[9] Agent Wright saw Welch at the Barnett Street house on several occasions, and Cedric confirmed that Welch sometimes "hung out" there. Welch clearly associated with Thomas, Chambers and the other defendants. The jury could have reasonably inferred from the phone records that, after his arrest in Louisville, Welch called the Barnett Street house from jail.

We hold that the evidence was sufficient to support the jury's conviction of McMillian in Count 1 for conspiracy to possess cocaine with the intent to distribute. Both Jackson and Cedric testified that McMillian sold crack at the Barnett Street house, and Jackson testified that McMillian worked for James. Agent Wright's testimony, the audiotapes and the videotape were evidence that McMillian participated in at least three sales of crack at the Barnett Street house.

---

[9]Welch objects, for the first time on appeal, to the testimony by Jackson, Steele and White that he had in the past sold crack cocaine in Moss Point and Louisville and had possessed a gun at the Barnett Street house at some unspecified date prior to June 1992. Welch concedes that he did not object to this testimony at trial, but argues that its admission was plain error under Rule 404(b). We disagree. The testimony was not Rule 404(b) evidence, but was introduced under Rule 401 as relevant evidence of Welch's participation in the charged conspiracy. No plain error was shown.

30

## Sufficiency on Substantive Possession Counts

### A: Carter - Count 6

Even though we today affirm Carter's conviction for conspiracy, we conclude that the evidence was insufficient to support the jury's conviction of Carter for participating in or aiding and abetting the June 16, 1992 crack cocaine transaction charged in Count 6.

Notwithstanding the inferences we must draw in favor of a guilty verdict, we reiterate that the burden of proof in this criminal case was on the government. The government must prove that the defendant was guilty beyond a reasonable doubt, not merely that he could have been guilty. United States v. Crain, 33 F.3d 480, 486 (5th Cir. 1994), cert. denied sub nom. Watkins v. United States, 115 S. Ct. 1142 (1995); United States v. Sacerio, 952 F.2d 860, 863 (5th Cir. 1992). The only piece of evidence that could link Carter to the June 16 transaction is that a car registered to Carter transported McMillian and another unidentified man to the buy location (a house on Church Street where Carter lived along with two other people). A reasonable jury could not infer from this fact that Carter, on June 16, 1992, intentionally possessed cocaine with the intent to distribute it. The government did not claim at trial, and does not argue on appeal, that Carter was the other man in the car or was otherwise present at the June 16 transaction. In fact, the government admitted that the confidential informant initially misidentified the car's other occupant as Terry Anthony Austin, Carter's brother, who was incarcerated at the time. The

government thus did not try to prove or even suggest who the "unidentified man" was.[10] The confidential informant who participated in the transaction did not testify. Further, the government did not argue or introduce any evidence tending to prove that Carter knew about or consented to the use of his car or residence for a drug deal on that day. No evidence, other than the movements of the car, was presented to show that Carter himself was present <u>anywhere</u> that day, either at the Barnett Street location,

---

[10]We note with disapproval that counsel for Derrick Carter attempts to mislead this Court in her brief and in oral arguments by stating that the government's evidence showed Austin to be the driver of the car. In fact, the government's direct examination of Wright indicated only that McMillian was in the car, and then Wright admitted on cross-examination by McMillian's counsel that the CI made an initial, incorrect determination that an unidentified man in the car with McMillian was Terry Austin:

Q:   And at one point in time, that unidentified black man was, in fact, identified, wasn't he?
A:   Yes, he was.
Q:   And he was identified as Terry Austin -- Terry Anthony Austin; is that correct?
A:   That's correct.
Q:   And he was identified by this CI, right?
A:   That's correct.
Q:   And what did your investigation reveal about the whereabouts of Terry Austin at this particular time?
A:   He was incarcerated at the time.
Q:   Okay. **So Terry Austin wasn't even there, it was impossible for him to have been there?**
A:   **That's correct.**

Despite this testimony, which showed that it was physically impossible for Terry Austin to have been in that car on June 16, 1992, Derrick Carter's counsel argues in her original and reply briefs that the car was "being driven by the Defendant Terry Anthony Austin," that "no evidence was put forth to show ... that Appellant Carter had any guilty knowledge of the activities of McMillian or Austin," and that "Austin is Appellant Carter's brother; for him to have borrowed the Appellant Carter's car is probably the rule rather than the exception."

32

the Church Street location, or at James' residence, where Carter's car was seen and photographed later on the evening of June 16. As we stated in United States v. Velgar-Vivero, 8 F.3d 236, 241 (5th Cir. 1993), cert. denied sub nom. Rivas-Cordova v. United States, 114 S. Ct. 1865 (1994), "the jury's conclusion that the government proved [Carter]'s guilt beyond a reasonable doubt was unreasonable as a matter of law."  As in United States v. Onick, 889 F.2d 1425, 1429 (5th Cir. 1989), we suspect that the jury "must have speculated [Carter] into a conviction," piling "inference upon inference," which it cannot do. For these reasons, we must reverse Carter's conviction in Count 6 for possession with the intent to distribute.[11]

## B: Welch - Counts 8 & 9

We hold that the evidence was sufficient to convict Welch of possession with intent to distribute in Count 8, which involved the

---

[11]Because it was unreasonable for the jury to have inferred Carter's guilt in Count 6 from the evidence presented regarding the events of June 16, 1992, it appears likely that the jury instead improperly considered the evidence introduced under Rule 404(b). The jury appears to have considered the evidence of Carter's "other crime, wrong or act," at the time the Church Street house was searched in July 1993 "in order to show conformity therewith," i.e., to infer that Carter had possessed crack cocaine a year earlier on June 16, 1992. Such an inference is expressly prohibited under the language of Rule 404(b) and the district court's instruction to the jury. See, e.g., United States v. Willis, 6 F.3d 257, 261 (5th Cir. 1993).
Because we reverse Carter's substantive possession conviction in Count 6 for insufficient evidence, we need not decide whether the district court abused its discretion by admitting evidence of the 1993 search of the Church Street house. With regard to Carter's conspiracy conviction in Count 1, we hold that the evidence was sufficient to prove conspiracy without regard to the Rule 404(b) evidence, so any error in admitting that evidence would be harmless with regard to that count.

first of the two June 1992 cocaine sales in Louisville, Mississippi at the Eialand Plaza Apartments. In that first, pre-midnight sale, charged in Count 8, the jury could have inferred that Welch aided and abetted the transaction by "vouching" for Chris White and telling Thomas "he's cool," allowing White to purchase the cocaine from Thomas. However, the second, post-midnight sale, charged in Count 9, was made to White by Chambers, and the uncontradicted evidence showed that Welch was not present at the transaction, or even at the apartment, and no evidence showed that Welch assisted the Count 9 transaction in any way. Therefore, we find the evidence insufficient to support the jury's conviction of Welch in Count 9, and that count is therefore reversed.

## C: McMillian - Counts 3, 5, 6 & 7

We also find that the evidence was insufficient to support the jury's conviction of McMillian in Count 3 for the April 23, 1992 transaction. On that day, as shown by the tape recording, the government-prepared transcript and Agent Wright's testimony, an undercover officer purchased 1.2 grams of crack cocaine from Mark Thomas. The government did not present any evidence that McMillian participated in or was present at the camp during that particular purchase, nor did the government even attempt to argue that McMillian aided or abetted the April 23 transaction in any way. As with Carter's conviction in Count 6 and Welch's conviction in Count 9, "the jury's conclusion that the government proved [McMillian]'s guilt beyond a reasonable doubt was unreasonable as a matter of law." Velgar-Vivero, 8 F.3d at 241. As we stated in a recent case,

34

"[a]lthough the strict nature of this [sufficiency of the evidence] standard demonstrates our reluctance to interfere with jury verdicts, this case is an example of why courts of appeal must not completely abdicate responsibility for reviewing jury verdicts."

Crain, 33 F.3d at 487 (quoting United States v. Ragan, 24 F.3d 657, 659 (5th Cir. 1994)). For these reasons, we reverse McMillian's conviction in Count 3 for possession with the intent to distribute.

However, we find that the evidence, including Agent Wright's testimony, the audiotapes and the videotape, was sufficient to convict McMillian in connection with the transactions in Counts 5, 6 and 7. With regard to the April 30, 1992 transaction, McMillian was seen and videotaped at the Barnett Street house that day, and his statements on the audiotape indicate that he searched the CI for microphones in connection with the drug purchase. On June 16, 1992, Agent Wright, listening on the body wire, heard McMillian tell the undercover purchaser to follow him to the Church Street house, where the sale was completed. On June 18, 1992, McMillian's voice can be heard on the audiotape during the transaction, discussing the other sale "last time" at the Church Street house and asking how much profit the buyer had made on that purchase. We find the evidence sufficient to support McMillian's convictions on these counts.

### Sufficiency on Welch's Firearm Count

Finally, we find that the evidence was insufficient to support Welch's conviction in Count 10 for using or carrying a firearm during and in relation to a drug trafficking crime (the June 1992 Eialand Plaza transactions), in violation of 18 U.S.C. § 924(c),

35

and/or aiding and abetting Chambers and Thomas in doing so. The gun in question, a .38-caliber semi-automatic pistol, was found along with another gun in the glove compartment of Thomas' car, which police found parked outside Welch's uncle's house while Welch and Thomas were inside the house sleeping. The government made no attempt to prove that Welch was ever in actual possession of the gun or used it. No fingerprints were found on the gun. Proof of actual use is not necessary under Section 924(c), but if such use is not shown, the government must prove that Welch knew about the firearm and that Welch had access to the firearm for protection in connection with his drug trafficking offense. United States v. Willis, 6 F.3d 257, 264 (5th Cir. 1993). The government has not met its burden of proof on this count. There was no evidence suggesting that Welch had any control over the car where the gun was found. No one testified that Welch had ever been inside Thomas' car, although the jury could have inferred that Welch rode in the car from the Eialand Plaza Apartments to the house where they both later were found asleep. Even if the jury could have inferred that Welch had any control over Thomas' car, this control alone would not have automatically connected him with the gun in the glove compartment. See United States v. Mergerson, 4 F.3d 337, 349 (5th Cir. 1993), cert. denied, 114 S. Ct. (1994); United States v. Ford, 993 F.2d 249, 252 (D.C.Cir. 1993) ("[I]n cases in which contraband or firearms are discovered in a place occupied by more than one person, the Government must establish 'the likelihood that in some discernible fashion the accused had a voice vis-a-vis' the items in

36

question."). We have found constructive possession in "joint occupancy" cases only when there was some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband. See, e.g., United States v. McKnight, 953 F.2d 898, 902 (5th Cir.)(weapon was found in plain view), cert. denied, 504 U.S. 989 (1992). In the instant case, the weapon was not in plain view and there were no other circumstantial indicia that established that Welch even knew about the weapon.

Nor was there any testimony or evidence that the pistol was connected in any way to the Eialand Plaza drug transactions. See United States v. Wilson, 884 F.2d 174, 177 (5th Cir. 1989)(noting that under § 924, "the government is shouldered with the burden of establishing some relationship between the firearm [] possessed and the predicate drug trafficking offense. ... [S]omething more than strategic proximity of drugs and firearms is necessary to honor Congress' concerns."). The government in this case did not even prove "strategic proximity." The Count 8 sale took place in an apartment, and the government did not introduce any testimony tending to show whether Thomas' car was even parked at the apartment complex during the drug transaction, or if it was, how far away it was parked from the apartment where the transactions took place, or whether the pistol was even in the car at that point. We have reversed Welch's cocaine possession conviction for the Count 9 transaction, but we note that there is even less evidence to connect the firearm with that sale; at that time the car was already across town parked outside Welch's uncle's house,

with its owner, Thomas, asleep inside. For these reasons, we find the evidence insufficient to support the jury's conviction of Welch for the firearms offense in Count 10, and that count is therefore reversed.

### Use of Audiotapes and Transcripts

Four audio recordings of the undercover cocaine purchases were played for the jury at trial, and the jury was given government-prepared transcripts of the taped conversations during the playing of the tapes. The jury was allowed to have the tapes, but not the transcripts, during deliberations. The court instructed the jury:

> "I'm going to allow you to use the transcript when you listen to the tapes, solely as an aid or an assistance to assist you in following what's on the tapes. However, the evidence is on the tape. You understand? If what's on the transcript is at variance from what you hear on that tape, then it is what you hear on the tape that controls."

Polk, Carter and McMillian claim on appeal that the recordings were of such poor quality that the jury could not possibly understand them, and they argue therefore that the government-prepared transcripts took on an improper evidentiary role. The appellants also claim that the tapes were not properly authenticated pursuant to Federal Rule of Evidence 901(b)(1) and (b)(5), because the CIs who were present at the transactions did not testify to identify the appellants' voices on the recordings.

When seeking to introduce a sound recording in a criminal prosecution, the government bears the burden of going forward with foundation evidence demonstrating that the recording as played is an accurate representation of the conversation or other sounds at

38

issue. <u>United States v. Stone</u>, 960 F.2d 426, 436 (5th Cir. 1992). This Circuit has given the district court broad discretion to determine whether this foundation has been met. <u>Stone</u>, 960 F.2d at 436; <u>United States v. Wilson</u>, 578 F.2d 67, 69 (5th Cir. 1978); <u>United States v. Mendoza</u>, 574 F.2d 1373, 1378 (5th Cir.), <u>cert. denied</u>, 439 U.S. 988 (1978). The Federal Rules of Evidence provide that the requirement of authentification "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a); <u>United States v. Lance</u>, 853 F.2d 1177, 1181 (5th Cir. 1988). To illustrate acceptable means of authenticating evidence, Rule 901(b) lists testimony of a witness with knowledge and, for identifying a voice, an "opinion based on hearing the voice at any time under circumstances connecting it with the alleged speaker." FED. R. EVID. 901(b)(1), (5); <u>Lance</u>, 853 F.2d at 1181. In the trial below, ATF Agent Wright testified that for each recorded transaction he equipped the confidential informant with the electronic monitoring equipment and that he monitored each transaction over the CI's body wire as it was occurring. During the April 28 transaction, for example, Wright testified that he was performing surveillance from the woods across the street and that he personally viewed McMillian and Polk at the recorded transaction and watched them as he simultaneously listened to their voices over the wire. During the April 30 and June 16 transactions, Wright testified that he was again stationed in the woods across the street and watched McMillian participate in at least part of each drug transaction while simultaneously listening

to the voices over the wire. Wright testified that he prepared the government transcripts after listening to each tape recording numerous times. He testified that each transcript was an accurate representation of the conversation he had heard over the wire. In light of this testimony, we hold that the tape recordings were sufficiently authenticated.

The appellants also claim that the taped conversations were so unintelligible that they could not prepare their own transcripts or even effectively challenge the accuracy of the government's transcripts. However, after carefully listening to the four tape recordings at issue in this case, we find no abuse of discretion in the district court's decision to admit them into evidence. While some portions of the recordings are inaudible or unintelligible as the appellants claim, much of the conversations can be heard clearly and may be followed on the government's transcripts. Cf. Wilson, 578 F.2d at 69. We therefore conclude that the quality of the recordings was not so poor that the appellants were precluded from making an effective challenge to the government transcripts, and we find no abuse of discretion in the court's use of the transcripts. The court correctly instructed the jurors that if they perceived any difference between the tapes and the transcripts, what they heard on the tapes should control. The actual content of the taped conversations was therefore a matter for the jury to determine. Wilson, 578 F.2d at 70 (citing United States v. Onori, 535 F.2d 938, 948-49 (5th Cir. 1976)).

## Evidence of Separate "Laurel Conspiracy"

The trial court allowed, over objection, evidence of an attempted five-kilogram cocaine transaction by James on July 24, 1992. The jury was instructed both before and after the testimony that the evidence related only to James and could not be used against the other defendants. Polk and McMillian claim on appeal that this evidence was so overwhelming that such instructions did not cure the "spillover" prejudice to them, and that they should have been granted a new trial. Such evidentiary rulings are reviewed for abuse of discretion. United States v. Stouffer, 986 F.2d 916, 924 (5th Cir.), cert. denied, 114 S. Ct. 115 (1993). The jury was properly instructed to use the evidence only against James, and juries are presumed to follow their instructions. United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir.), cert. denied sub nom. Nunn v. United States, 114 S. Ct. 266 (1993). We find no abuse of discretion.

## Requests for Severance

Carter and Welch claim on appeal that the district court erred in denying their motions to sever their trials from that of the other defendants, especially James. They claim that joinder was improper because of the prejudicial "five-kilogram" evidence admitted against co-defendant James, and that therefore the joint trial with James caused them great prejudice.

The initial joinder of Polk, Carter, Welch and McMillian with James for trial was legitimate because they were charged with having conspired with each other. United States v. Thomas, 12 F.3d

41

1350, 1363 (5th Cir.), cert. denied sub nom. Sanchez v. United States, 114 S. Ct. 1861 (1994); United States v. Elam, 678 F.2d 1234, 1250 (5th Cir. 1982). The district court's decision of whether to grant a severance is reviewable only for an abuse of discretion. United States v. Stotts, 792 F.2d 1318, 1321 (5th Cir. 1986), cert. denied, 493 U.S. 861 (1989); see also United States v. Salomon, 609 F.2d 1172, 1175 (5th Cir. 1980) ("To establish an abuse of discretion of the district court, a defendant must show that he received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection."). An appellant must show something more than the fact that a separate trial might offer him a better chance of acquittal. United States v. Berkowitz, 662 F.2d 1127, 1132 (5th Cir. 1981). In this case, the government introduced sufficient evidence to demonstrate that Carter, Welch and the other appellants were guilty of conspiracy. Moreover, even if some risk of prejudice existed, the district court properly instructed the jury to limit evidence to the appropriate defendant. We find no abuse of discretion in the district court's refusal to grant severance.

CONCLUSION

For the reasons stated above, we AFFIRM the convictions of appellants Polk, Carter, Welch and McMillian in Count 1, of appellant McMillian in Counts 5, 6 and 7, and of appellant Welch in Count 8. We find that the evidence was insufficient to support the

42

convictions of appellant McMillian in Count 3, of appellant Carter in Count 6 and of appellant Welch in Counts 9 and 10, and we therefore REVERSE those convictions.

We see no need to remand the cases of appellants McMillian and Carter for resentencing because their counts of conviction were grouped under the Sentencing Guidelines and their sentences were set to run concurrently.[12] However, because the firearms offense we reverse in Count 10 was set to run consecutively, Welch's case must be remanded to the district court for resentencing in accordance with this opinion.

---

[12]The reversal of the substantive cocaine possession convictions does not affect the district court's computation of the quantity of cocaine attributable to each defendant, because the court determined quantity from the evidence on the conspiracy count, which we affirm in this opinion. Noting that Jackson had testified that James' workers at the Barnett Street house sold a kilogram every two weeks and that the conspiracy was alleged to have lasted about two years, the court found that each conspirator could be held responsible for 48 kilograms of cocaine. However, "out of a sense of justice" and "to be fair under the circumstances," the court halved that amount and held each appellant responsible for 24 kilograms of cocaine at sentencing. The correctness of this calculation under the Sentencing Guidelines was not appealed and is thus not before us.